## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

RICHARD GLOVER; TINA GLOVER, on her own and on behalf of her son R.G, a minor,

                *Plaintiffs*,

v.

MONICA RIVAS; GREGORY GORDON; JENNIFER SIERMINSKI; KEARA MUZZIN; DOUGLAS SMITH; JEREMY HOWARD; SHAWN BREWER; KEVIN LINDSEY; NOAH NAGY; KIMBERLY NAPIER; KARINA BLAIR; STACEY PURDY; JOEL SALINAS; CHRISTINE MCCUMBER-HEMRY; ALE SCHNEIDER; SHERYL BAILEY; PAUL ANDERSON; JEFFREY UTTER; ERNEST PAZITKA; BRITANCIA DOSS; JENNIFER CRANE; WILLIAM HOKANSON; MICHAEL KENNEDY; NICHOLAS KIK; CHRIS KNAPP; MARVIN MOSELEY; JACQUELYN THELEN; BRIAN MADERY; JENNIFER NORDER; PATRICIA ROGERS; VALERIE LASHLEY; GORDON HILL; JAMES KING; MICHAEL DEMPS; NICOLE PITCHER; NE'TESHA DEMYERS; SHANE RENNELLS; KHRIS NEVINS; VICTORIA HALLET; JAMES KING; JOSEPH IOSEFA; SERGEANT REYNOLDS; DEVIN FREYMUTH; OFFICER SNYDER; CRYSTAL BROWN; NURSE BILLS; WILLIAM MARSH; LINNIE BROOKS; SAMUEL

Case No.

Hon.

1

DELOSSANTOS; TARHAKA MCELROY;
JAY COOLEY; and VINCENT RICKMAN,

     *Defendants*,

_____/

EXCOLO LAW, PLLC
Solomon M. Radner (P73653)
Madeline M. Sinkovich (P82846)
*Attorneys for Plaintiff*
26700 Lahser Road, Suite 401
Southfield, MI 48033
(866) 939-2656
sradner@excololaw.com

_____/

## COMPLAINT AND JURY DEMAND

Plaintiffs, Richard Glover, Tina Glover, and R.G., by and through their attorneys, EXCOLO LAW, PLLC, complaining of Defendants, respectfully allege as follows:

## JURISDICTION AND VENUE

1.    This is a civil rights action in which the Plaintiffs seeks relief for the violation of their rights secured by 42 U.S.C. § 1983, the First Amendment and the Fourth Amendment, Fourteenth Amendment, 42 U.S.C. § 12101 and 29 U.S.C. § 791.

2.    Jurisdiction of this Court is found upon 28 U.S.C. § 1331 since this action arises under the Constitution and laws of the United States.

3.     Venue is proper in the United States District Court for the Eastern District of Michigan because the majority of the events complained of occurred at G. Robert Cotton Correctional facility in Jackson, Michigan.

4.     Plaintiff Richard Glover has complied with all respects of the Pre-Exhaustion Requirements of the Prison Litigation Reform Act through the appropriate grievance processes of the MDOC for the grievances upon which this litigation is based.

5.     This grievance system is a sham as is the MDOC's so-called investigations. Rarely, if ever, does the MDOC actually find any wrongdoing, no matter how egregious the MDOC's personnel's grieved conduct.

6.     Plaintiff has filed repeated detailed grievances addressing the issues raised in this action. Plaintiff has exhausted all administrative remedies.

## PARTIES

7.     Plaintiff, RICHARD GLOVER ("Mr. Glover), was at all times relevant a prisoner in the custody of the Michigan Department of Corrections ("MDOC").

8.     Mr. Glover is currently confined at the G. Robert Cotton Correctional Facility ("JCF"), in Jackson, Michigan.

9.     Plaintiff, TINA GLOVER ("Mrs. Glover), is a citizen of the United States and a resident of the state of Michigan. Mrs. Glover is married to Mr. Glover.

10.     Plaintiff, R.G. ("R.G."), is a minor citizen of the United States and a resident of the state of Michigan. Mr. and Mrs. Glover are the parents of R.G.

11.     Upon information and belief, all individual defendants were at all pertinent times Michigan residents and are being sued in their individual, supervisory capacities, and official capacities as permitted by law.

12.     Defendant, MONICA RIVAS ("Rivas"), was at all times relevant a Michigan resident and a corrections officer at JCF. Defendant Rivas is being sued in her individual capacity.

13.     Defendant, GREGORY GORDON ("Gordon"), was at all times relevant a Michigan resident and a sergeant corrections officer at JCF. Defendant Gordon is being sued in his individual and supervisory capacity.

14.     Defendant, JENNIFER SIERMINSKI ("Sierminski"), was at all times relevant a Michigan resident and a corrections officer at JCF. Defendant Sierminski is being sued in her individual capacity.

15.     Defendant, KEARA MUZZIN ("Muzzin"), was at all times relevant a Michigan resident and a lieutenant corrections officer at JCF. Defendant Muzzin is being sued in her individual and supervisory capacity.

16.     Defendant, DOUGLAS SMITH ("Smith"), was at all times relevant a Michigan resident and the deputy warden at JCF. Defendant Smith is being sued in his individual and supervisory capacity.

17.     Defendant, JEREMY HOWARD ("Howard"), was at all times relevant a Michigan resident and the deputy warden at JCF. Defendant Howard is being sued in his individual and supervisory capacity.

18.     Defendant, SHAWN BREWER ("Brewer"), was at all times relevant a Michigan resident and the Warden at JCF. Defendant Brewer is being sued in his individual and supervisory capacity.

19.     Defendant, KEVIN LINDSEY ("LINDSEY"), was at all times relevant a Michigan resident and the warden at JCF. Defendant Lindsey is being sued in his individual and supervisory capacity.

20.     Defendant, NOAH NAGY ("Nagy"), was at all times relevant a Michigan resident and the warden at JCF. Defendant Nagy is being sued in his individual and supervisory capacity.

21.     Defendant, KIMBERLY NAPIER ("Napier"), was at all times relevant a Michigan resident and the warden's administrative assistant at JCF. Defendant Napier is being sued in her individual capacity.

22.     Defendant, KARINA BLAIR ("Blair"), was at all times relevant a Michigan resident and the facility manager at JCF. Defendant Blair is being sued in her individual and supervisory capacity.

23.     Defendant, STACEY PURDY ("Purdy"), was at all times relevant a Michigan resident and the classification director at JCF. Defendant Purdy is being sued in her individual capacity.

24.     Defendant, JOEL SALINAS ("Purdy"), was at all times relevant a Michigan resident and the Inspector at JCF. Defendant Salinas is being sued in his individual and supervisory capacity.

25.     Defendant, CHRISTINE MCCUMBER-HEMRY ("McCumber-Hemry"), was at all times relevant a Michigan resident and the hearings / grievance investigator at JCF. Defendant McCumber-Hemry is being sued in her individual capacity.

26.     Defendant, ALE SCHNEIDER ("Schneider"), was at all times relevant a Michigan resident and the hearings officer at JCF. Defendant Schneider is being sued in his individual capacity.

27.     Defendant, SHERYL BAILEY ("Bailey"), was at all times relevant a Michigan resident and a captain at JCF. Defendant Bailey is being sued in her individual and supervisory capacity.

28.     Defendant, PAUL ANDERSON ("Anderson"), was at all times relevant a Michigan resident and a captain at JCF. Defendant Anderson is being sued in his individual and supervisory capacity.

29.    Defendant, JEFFREY UTTER ("Utter"), was at all times relevant a Michigan resident and a lieutenant at JCF. Defendant Utter is being sued in his individual and supervisory capacity.

30.    Defendant, ERNEST PAZITKA ("Pazitka"), was at all times relevant a Michigan resident and a unit supervisor at JCF. Defendant Pazitka is being sued in his individual and supervisory capacity.

31.    Defendant, BRITANCIA DOSS ("Doss"), was at all times relevant a Michigan resident and the prison counselor at JCF. Defendant Doss is being sued in her individual capacity.

32.    Defendant, JENNIFER CRANE ("Crane"), was at all times relevant a Michigan resident and an officer at JCF. Defendant Crane is being sued in her individual capacity.

33.    Defendant, WILLIAM HOKANSON ("Hokanson"), was at all times relevant a Michigan resident and an officer at JCF. Defendant Hokanson is being sued in his individual capacity.

34.    Defendant, MICHAEL KENNEDY ("Kennedy"), was at all times relevant a Michigan resident and an officer at JCF. Defendant Kennedy is being sued in his individual capacity.

35.     Defendant, NICHOLAS KIK ("Kik"), was at all times relevant a Michigan resident and an officer at JCF. Defendant Kik is being sued in his individual capacity.

36.     Defendant, CHRIS KNAPP ("Knapp"), was at all times relevant a Michigan resident and an officer at JCF. Defendant Knapp is being sued in his individual capacity.

37.     Defendant, MARVIN MOSELEY ("Moseley"), was at all times relevant a Michigan resident and an officer at JCF. Defendant Moseley is being sued in his individual capacity.

38.     Defendant, JACQUELYN THELEN ("Thelen"), was at all times relevant a Michigan resident and an officer at JCF. Defendant Thelen is being sued in her individual capacity.

39.     Defendant, BRIAN MADERY ("Madery"), was at all times relevant a Michigan resident and a mail room employee at JCF. Defendant Madery is being sued in his individual capacity.

40.     Defendant, JENNIFER NORDER ("Norder"), was at all times relevant a Michigan resident and a mail room employee at JCF. Defendant Norder is being sued in her individual capacity.

41.     Defendant, PATRICIA ROGERS ("Rogers"), was at all times relevant a Michigan resident and a mail room employee at JCF. Defendant Rogers is being sued in her individual capacity.

42.     Defendant, VALERIE LASHLEY ("Lashley"), was at all times relevant a Michigan resident and the records officer supervisor at JCF. Defendant Lashley is being sued in her individual and supervisory capacity.

43.     Defendant, GORDON HILL ("Hill"), was at all times relevant a Michigan resident and a sergeant at JCF. Defendant Hill is being sued in his individual and supervisory capacity.

44.     Defendant, JAMES KING ("King"), was at all times relevant a Michigan resident and a resident unit manager at JCF. Defendant King is being sued in his individual and supervisory capacity.

45.     Defendant, MICHAEL DEMPS ("Demps"), was at all times relevant a Michigan resident and a sergeant at JCF. Defendant Demps is being sued in his individual and supervisory capacity.

46.     Defendant, NICOLE PITCHER ("Pitcher"), was at all times relevant a Michigan resident and an officer at JCF. Defendant Pitcher is being sued in her individual capacity.

47.     Defendant, NE'TESHA DEMYERS ("DeMyers"), was at all times relevant a Michigan resident and a lieutenant at JCF. Defendant DeMyers is being sued in her individual and supervisory capacity.

48.     Defendant, SHANE RENNELLS ("Rennells"), was at all times relevant a Michigan resident and a sergeant at JCF. Defendant Rennells is being sued in his individual and supervisory capacity.

49.     Defendant, KHRIS NEVINS ("NEVINS"), was at all times relevant a Michigan resident and a lieutenant at JCF. Defendant Nevins is being sued in his individual and supervisory capacity.

50.     Defendant, VICTORIA HALLET ("Hallet"), was at all times relevant a Michigan resident and a medical doctor contracted to work at JCF. Defendant Hallet is being sued in her individual capacity.

51.     Defendant, JAMES KING ("King"), was at all times relevant a Michigan resident and a resident unit manager at JCF. Defendant King is being sued in his individual and supervisory capacity.

52.     Defendant, JOSEPH IOSEFA ("Iosefa"), was at all times relevant a Michigan resident and a lieutenant at JCF. Defendant Iosefa is being sued in his individual and supervisory capacity.

53.     Defendant, Sergeant REYNOLDS ("Reynolds"), was at all times relevant a Michigan resident and a sergeant at JCF. Defendant Reynolds is being sued in his individual and supervisory capacity.

54.     Defendant, DEVIN FREYMUTH ("Freymuth"), was at all times relevant a Michigan resident and an officer at JCF. Defendant Freymuth is being sued in his individual capacity.

55.     Defendant, Officer SNYDER ("SNYDER"), was at all times relevant a Michigan resident and an officer at JCF. Defendant Snyder is being sued in his individual capacity.

56.     Defendant, CRYSTAL BROWN ("Brown"), was at all times relevant a Michigan resident and a registered nurse at JCF. Defendant Brown is being sued in her individual capacity.

57.     Defendant, Nurse BILLS ("Bills"), was at all times relevant a Michigan resident and a registered nurse at JCF. Defendant Bills is being sued in his individual capacity.

58.     Defendant, WILLIAM MARSH ("Marsh"), was at all times relevant a Michigan resident and an officer at JCF. Defendant Marsh is being sued in his individual capacity.

59.     Defendant, LINNIE BROOKS ("Brooks"), was at all times relevant a Michigan resident and an officer at JCF. Defendant Brooks is being sued in her individual capacity.

60.     Defendant, SAMUEL DELOSSANTOS ("Delossantos"), was at all times relevant a Michigan resident and an officer at JCF. Defendant Delossantos is being sued in his individual capacity.

61.     Defendant, TARHAKA MCELROY ("McElroy"), was at all times relevant a Michigan resident and an officer at JCF. Defendant McElroy is being sued in her individual capacity.

62.     Defendant, JAY COOLEY ("Cooley"), was at all times relevant a Michigan resident and an officer at JCF. Defendant Cooley is being sued in his individual capacity.

63.     Defendant, VINCENT RICKMAN ("Rickman"), was at all times relevant a Michigan resident and an officer at JCF. Defendant Rickman is being sued in his individual capacity.

64.     The defendants being sued in their supervisory capacities at the very least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending subordinates.

65.    When the violations alleged in this complaint occurred, none of the above-named individuals were acting in furtherance of a legitimate governmental function and thus are not entitled to governmental immunity.

## STATEMENT OF FACTS

66.    On November 18, 2016 Mrs. Tina Glover and her infant son, R.G., went to visit her husband and father of her son, Mr. Richard Glover, at JCF. Before her visit, Mrs. Glover had made arrangements with a sergeant so that she could bring her son's baby blanket and bottle in to the visit.

67.    Upon arrival, Defendant Rivas told Mrs. Glover that she could not bring the baby blanket and bottle inside of the facility. Mrs. Glover explained that she had gotten permission and requested to speak to shift command.

68.    Shift command, Defendant Gordon, arrived and told Mrs. Glover that she would not be able to bring the baby blanket and bottle, despite her explaining that she had received permission from Sergeant Cooper to bring the items in for her visit.

69.    In order to have the visit with her husband, Mrs. Glover placed the baby blanket and bottle inside of her locker. Upon entering the gates, Defendant Rivas conducted a pat down on Mrs. Glover.

70.    When conducting the pat down, Defendant Rivas aggressively groped Mrs. Glover's breasts, and her inner thighs/genital area.

71.   Defendant Rivas's pat down of Mrs. Glover exceeded a reasonable search and was done in response to Mrs. Glover's request to see shift command.

72.   After groping Mrs. Glover, Defendant Rivas required a strip search of baby R.G. Mrs. Glover was required to remove all of R.G.'s clothing in an area open to others so that Rivas could watch Mrs. Glover change her son's diaper.

73.   MDOC Policy does not require infants to be stripped searched in order to enter the facility. Defendant Rivas had no basis to strip search R.G.

74.   Defendant Rivas acted in retaliation when she forced Mrs. Glover to strip her infant son in order to have a visit with her husband.  Mrs. Glover had never been required to strip her son naked on any prior visit or any visit after.

75.   After this incident, Mrs. Glover was visibly shaken and crying when she met her husband for their visit. Mr. and Mrs. Glover immediately asked Defendant Sierminski if they could speak to shift command. Defendant Sierminski would not permit the Glovers to speak to shift command.

76.   Mr. and Mrs. Glover described the incident to Defendant Sierminski in detail and asked again if they could speak to shift command about Defendant Rivas. In response, Defendant Sierminski threatened to terminate their visit if they requested shift command again.

77. Defendant Sierminski's threat was an act of retaliation against Mr. and Mrs. Glover for asking to talk to shift command about Defendant Rivas's unlawful conduct.

78. Sometime later during the visit, Defendant Smith, the deputy warden, was doing rounds with Defendant Howard, also a deputy warden. Mr. and Mrs. Glover explained what had happened with Defendant Rivas and Defendant Sierminski. Defendant Smith informed Mrs. Glover that he would look into it and get back to her as soon as possible. However Defendant Smith looked into the situation, this was the beginning of endless retaliation and harassment against the Glovers.

79. Mr. Glover filed a grievance about Defendant Sierminski and Defendant Rivas. Defendant Gordon called Mr. Glover out from his work assignment to discuss the grievance he wrote about the incident with Defendants and spent over an hour pressuring Mr. Glover to sign off on the grievance and state that Mrs. Glover was lying about the incident with Rivas. Mr. Glover refused, and Defendant Gordon continued to pressure him to retract the grievance.

80. Shortly after, Defendant Keara Muzzin, a lieutenant officer, sought out and confronted Mr. Glover in the dining hall and told him that she had watched the video of his wife at the security gate and that as far as she was concerned,

Rivas did not search Mrs. Glover enough and if Muzzin could, she would write Mr. Glover a misconduct ticket for filing his grievance.

81. In Mr. Glover's grievance, he included that there was a witness to the inappropriate touching of his wife, a visitor who was willing to write an affidavit that supported Mrs. Glover's accusations. The grievance was reviewed and denied by Defendant Gordon, even though Defendant Gordon was involved in the incident. Upon information and belief, when the grievance was denied, there was no attempt by Defendant Gordon to speak with or attempt to contact the witness.

82. Upon information and belief, and according to an officer who worked in the control center and processed visits at the gate, Mr. and Mrs. Glover's names were "ringing bells" in administration as a result of Mr. and Mrs. Glover's complaint about the incident with Defendant Rivas.

83. Upon information and belief, Rivas has been reassigned because of the complaint and other officers at the facility were unhappy about the reassignment. More than one officer told Mr. Glover to be careful and warned of retaliation from Defendant Gordon, Defendant Muzzin, and Captain Schiller because of their grievance and complaints against Rivas and Sierminski. Upon information and belief, staff throughout the facility were aware of retaliation and a plan to retaliate against the Glovers.

84.     After filing the second step of his grievance, Mr. Glover was informed that he was being sent up north across the bridge because he had filed a grievance on the wrong person. Mr. Glover detailed the following conversation in his grievance over the retaliatory transfer:

a.  While being processed for transfer, Mr. Glover asked the officer where he was going. In response, the officer said, "Who are you." He then looked at Mr. Glover and said, "I know who you are" and proceeded to look at a piece of paper then stated, "You are fucked is where you are going, you're going way up there, who did you piss off man, you must have filed a grievance on the wrong person." Mr. Glover responded that he only had one grievance pending and did not think he pissed anyone off. The officer responded, "Whoever it is, is trying to shut you up, good luck, stay out of trouble."

85.     On his way out of JCF, Mr. Glover noticed Defendant Rivas sitting at the information desk making noises and trying to get his attention. Defendant Rivas then smiled, waived, and said "bye" to Mr. Glover and that she would be waiting if he ever returned to that facility.

86.     Mr. Glover was the lead baker for JCF Food Services department and had no disciplinary charges against him when he was transferred to Chippewa

Correctional, ("URF"), a facility in the UP, far away from his wife and infant son.

87.   Upon information and belief, Defendant Valerie Lashley, Defendant Smith and Defendant Howard had Mr. Glover transferred.

88.   Once at URF, Mr. Glover was called into an inspectors' office concerning an investigation by Defendant Paul Anderson into the statements of retaliatory transfer made by the officer in his grievance.  A few weeks later, Mr. Glover was again called into the inspector's office to answer another questionnaire from Defendant Sheryl Bailey about his grievance for the retaliatory transfer.

89.   On September 26, 2017, Mr. Glover was transferred back to JCF.

90.   Upon information and belief, and according to the officer who approached Mr. Glover on the day of his return to JCF, the officer in Mr. Glover's retaliatory transfer grievance had been investigated and punished, and that some staff do not want Mr. Glover at JCF.

91.   Upon information and belief, the retaliation and situation between Mr. Glover and Defendant Rivas, and other supervisory staff at JCF, was known throughout the facility. The day after his return to JCF, Mr. Glover saw some officers he knew from his previous time at the facility and their reaction

demonstrates the widespread knowledge of retaliation: Upon learning of Mr. Glover's return, he was told, "Don't let Rivas find out you're back."

92.     Within the first week of his return to JCF, Mr. Glover's phone privileges were cut off for no legitimate reason. Mr. Glover had done nothing to provoke a loss of privileges. Upon information and belief, Mr. Glover's phone privileges were restricted because Mr. Glover was a "legal beagle" with a "target on his back."

93.     A few days later, Defendant Rivas had Mr. Glover handcuffed and sent to segregation by Defendant Rivas while he was attending school. Mr. Glover had not done anything wrong to justify Defendant Rivas's decision to send him to segregation. Defendant Rivas ordered him and other random inmates for a shakedown. After she performed her search of Mr. Glover, without any incident, she proceeded to call for officer assistance and had Mr. Glover taken to segregation for no reason as he had not done anything wrong.

94.     Once in segregation, Defendant Sgt. Demps spoke with Mr. Glover. Mr. Glover informed him of what happened and requested video of the shakedown to demonstrate that he did nothing wrong and sending him to the hole was just more retaliation from Rivas. Defendant Demps responded that Rivas didn't know Glover and denies everything. Demps proceeded to inform Mr.

Glover that he will be issued a misconduct ticket, despite his knowledge of Mr. Glover's innocent and without reviewing the video footage.

95.     Once Mr. Glover was released from segregation, an officer apologized to Mr. Glover for what was going on and returned Mr. Glover's phone privileges. Upon information and belief, officers were being instructed to shake down Mr. Glover's cell and belongings only. Upon information and belief, officers reported the retaliatory conduct to the warden and other supervisor officers. Upon information and belief, the union representative did not represent Rivas during the investigation of Rivas's conduct to Mr. and Mrs. Glover and that Rivas was investigated, suspended and reassigned.

96.     Mr. Glover requested to speak with shift command and was sent to the control center to speak with Defendant Lt. Utter about Defendant Rivas throwing him in segregation out of retaliation and how she worked in the school building where Mr. Glover took classes. Lt. Utter responded by stating that he already knows of the problems with Defendant Rivas, but refused do anything to remedy the situation.  Mr. Glover spoke to another officer and told him he wanted to go to the hole where he would be safe and not set up, and hopefully ride out of JCF. The officer advised Mr. Glover not to go to the hole, but to write everything down and send a letter to the deputy.

97.     Mr. Glover filed a grievance about being placed in segregation out of retaliation and wrote a letter to Defendant Lindsey describing the retaliation and asking him to view the security footage showing he did nothing to deserve being thrown in the hole for several hours, to no resolve.

98.     To avoid further contact with Rivas, Mr. Glover requested to be removed from callouts at the school where Rivas worked. When he had not received a response, Mr. Glover spoke with Defendant Demps and requested some form of assistance to ensure he would not be a victim to Rivas's continued retaliation. Demps told him no and threatened to have Rivas to write him more misconducts. Mr. Glover made the same request to Defendant Utter, describing his fear of continued harassment and false allegations from Rivas. Utter also refused to assist Mr. Glover or do anything about Rivas.

99.     When Mr. Glover returned to his unit instead of going to the call out, Rivas called his unit looking for Mr. Glover. The unit officer, already aware of the situation with Rivas, did not require Mr. Glover to go to the call out.

100.    Shortly after, Mr. Glover went to his callout in healthcare / dental. Classification Director, Defendant Stacey Purdy, and Defendant Gordon then wrote Mr. Glover a false misconduct ticket for being "Out of Place." Mr. Glover was not "out of place" and the ticket was dismissed because the records

demonstrated that Mr. Glover had a health care/dental call out during the time and was therefore not "out of place" but merely at his scheduled appointment.

101.   On October 23, 2017, Mr. Glover wrote a letter to hearings investigator, Joel Salinas, requesting the documents related to his misconduct hearing where he was found not guilty of Purdy's "out of place" ticket. According to policy, Mr. Glover was entitled to the report and findings of his dismissed ticket and Salinas would not provide these documents to Mr. Glover.

102.   Upon information and belief, Defendant Salinas was in a relationship with Defendant Rivas.  Mr. Glover filed a grievance against Joel Salinas for his failure to provide Mr. Glover with the hearing investigation documents that he was entitled to and which proved his innocence and Defendants false ticket.

103.   As a result of the issues Mr. Glover was facing at JCF, specifically retaliation and harassment by staff, Mr. Glover was forced to drop all of his Jackson College classes for the semester.

104.   On October 28, 2017, Mr. Glover was called to the officer desk by Defendant Kik and Defendant Jennifer Crane. Kik informed Mr. Glover that Rivas had called the unit requesting the Mr. Glover return his college textbook. Mr. Glover told Officer Kik that the book was to be returned to Jackson College staff, not Defendant Rivas. Mr. Glover also informed the officers of the active investigation between him and Rivas and requested to see a sergeant. Kik

responded that she did not care about the situation with Rivas and refused to call a sergeant. Mr. Glover told the officers that he would return the book to Jackson College facilitator.

105. Officer Crane then gave Mr. Glover direct order to take the college book to officer Rivas in the school. Mr. Glover returned the book to the school and gave it to Officer Black on the first floor. Officer Black, aware of the issues between Mr. Glover and Rivas, told Mr. Glover that she would make sure the book was returned.

106. In response to this Order, Mr. Glover requested a grievance form on two separate occasions. Officer Crane refused to provide a grievance form to Mr. Glover. Mr. Glover asked another inmate to ask Officer Crane for a grievance form and to give it to Mr. Glover. The other inmate asked, was given the form, and gave it to Mr. Glover to complete. Mr. Glover filed this grievance on the same day.

107. Mrs. Glover sent an email to the Jackson College Facilitator, concerning the textbook, asking if the professor actually requested Richard's book to be returned. The facilitator responded to the email within an hour and stated that the professor had not called for Richard to return any books. Plaintiff filed a grievance this abuse of authority and intentional retaliation and harassment and wrote another letter to Defendant Lindsey.

108.   On November 15, 2017, While Mr. Glover was on a visit, Defendants Jacquelyn Thelen and Moseley searched his property for over two hours. When Mr. Glover returned from his visit, Defendant Thelen told him "I didn't want to shake your cell down like that but I got a call." After this search, his cell was in disarray and several of Mr. Glover's legal documents disappeared including declarations from Mr. Glover, other prisoners, and his notes. Mr. Glover wrote a grievance against Defendants Thelen and Moseley for their conduct.

109.   Two days later, Defendant Bailey wrote a false misconduct ticket against Mr. Glover stating that he slammed the door and caused the window to shatter. That same day Mr. Glover was moved from C-Unit to D-Unit.

110.   Mr. Glover wrote a statement explaining that he had not caused the window to shatter and sent a copy to the Warden. No administrative hearing was ever held for this misconduct ticket. Upon information and belief, the misconduct ticket was thrown out by Warden Steward.

111.   Mr. Glover wrote a letter to Prison Counselor Defendant Britanica Doss about the move, but did not get a response. Mr. Glover filed a grievance alleging this move was done in retaliation for his grievance against Thelen and Moseley. His grievance was rejected.

112.   Mrs. Glover had been sending mail to Mr. Glover. However, none of her mail was being given to Mr. Glover and was held in the mailroom for nearly

two weeks at times or given to Mr. Glover in bits and pieces and not in whole as sent by Mrs. Glover.

113. The Glovers made numerous complaints to the JCF administration about mailroom staff, Defendants Brian Madery, Joan Norder, and Patricia Rogers, withholding his mail. Mrs. Glover continued to make complaints and request information from the director's office about the withholding of her husband's mail.

114. In response to the complaints, Defendant Madery issued a notice of mail rejection, rejecting Mr. Glover's mail falsely claiming it was "voluminous" and against MDOC policy. This was not part of the policy.

115. Mr. Glover wrote a letter to Defendant Napier, the Warden's administrative assistant, and Defendant Blair, the facility manager, regarding mailroom staff Defendant B. Madery's retaliation and other mailroom staff's rejection and withholding of his mail. On the same day, he wrote a letter to the mailroom staff regarding their reason for rejecting the mail sent from Mrs. Glover and wrote a grievance against them for retaliation and abuse of the mail policies.

116. An administrative hearing was held by Defendant Doss about the rejected mail. According to Doss, she upheld the rejection because she was instructed to do so by Defendant Napier. Mr. Glover filed a grievance appealing the mail rejection hearing.

117. Soon after, Mrs. Glover sent a JPAY message and five photos to Mr. Glover and Mr. Glover sent a message to Mrs. Glover. Neither Mrs. Glover nor Mr. Glover received each other's JPAY messages.

118. Mr. Glover sent a letter to the mailroom about the electronic messages/ JPAs, to no avail. Mrs. Glover contacted two JPAY representatives who both verified that the transactions had been sent and stated that the facility was responsible for blocking the messages. There was no legitimate reason to block their messages.

119. After sending his letter and learning that facility was blocking the messages, Mr. Glover wrote a grievance against mailroom staff for retaliation for intentionally blocking Mr. and Mrs. Glover's communication for no lawful basis.

120. Defendant Napier told Mr. Glover that some of the mail sent from Mrs. Glover had tracking numbers which were tampered with by the mailroom staff. Napier took the envelopes to the post master general who confirmed that the tracking numbers had in fact been removed from the envelopes after they were received by the facility. Other than informing Mr. Glover, Napier did nothing to intervene or remedy the situation.

121. The next day after learning this information, Mr. Glover filed a grievance with the inspector's office against the mailroom staff for obstruction

of correspondence with intent to impede the Glover's communication and retaliate against them for filing complaints.

122. During the course of the grievance process for Mr. Glover's grievance regarding the rejection of his mail, Defendant Blair falsified and/or altered documents, specifically the dates on which the response was returned to Mr. Glover. Mr. Glover filed a grievance on Defendant Blair's actions.

123. On 2/23/18, Defendant Kennedy wrote Mr. Glover a false misconduct ticket falsely alleging that Mr. Glover called Kennedy a "fucking faggot."

124. Upon information and belief, Defendant Kennedy wrote the ticket in response to Mr. Glover's filing grievances on other officers. Mr. Glover sent a letter to Defendant Warden Lindsey explaining Kennedy's falsifying the misconduct, and the staff abuse and retaliation he was experiencing and filed a grievance. Mr. Glover wrote a statement regarding his upcoming hearing on the misconduct ticket issued by Kennedy and attached witness statements and requested video footage be viewed, as it supported his story and disproved Kennedy's claims.

125. Defendant King held the hearing for the misconduct ticket issued by Kennedy. King found Mr. Glover guilty and issued 30 days loss of privileges as punishment. Prior to finding Mr. Glover guilty, Mr. Glover asked King to review the video footage of his unit. King advised Mr. Glover that he was finding Mr.

Glover guilty based solely on Defendant Kennedy's statement. Mr. Glover tried to explain that everything in the ticket is fabricated and it was even written two days after the alleged incident took place. In response, Defendant King told Mr. Glover to "appeal it." Mr. Glover asked who he should appeal it to. Defendant King stated, "Deputy Smith… good luck." Mr. Glover did appeal the misconduct, and Defendant Smith, unsurprisingly, denied the appeal. Mr. Glover filed a grievance against Defendant King for retaliation.

126.   Defendant McCumber-Hemry, the grievance coordinator, intentionally mislabeled Mr. Glover's grievance so that it would not be investigated, in violation of policy. Mr. Glover wrote McCumber-Hemry a letter in attempt to resolve the issue. Mr. Glover did not receive a response. Mr. Glover then filed a grievance on McCumber-Hemry. Mr. Glover did not receive a response to his grievance and sent a kite for the Step II appeal form. Several days later Mr. Glover was issued another Step I Grievance Receipt with a new and proper grievance number for his grievance against Defendant King, and a rejection for his grievance on McCumber-Hemry. Both grievances were signed by McCumber-Hemry but did not provide explanation for the wrongful mislabeling, wrongful rejection, or untimeliness of her response and processing of Mr. Glover's grievance.

127.   Mr. Glover wrote a letter to Defendant Lindsey regarding Defendant Smith's denial of his appeal and requesting it be overturned, as well as grievance staff altering and falsifying documents. Defendant Lindsey never responded. Mr. Glover sent his letter to the Office of Legislative Corrections Ombudsman for resolution as well, but received no response.

128.   In May 2018, after Mrs. Glover filed a complaint about Defendant Brooks' continued harassment at the entrance gate, Defendant Brooks forced Mrs. Glover to expose her breasts without consent in order to have her visit with Mr. Glover.

129.   On June 20, 2018, Mr. Glover had a visit with Mrs. Glover and his son. During the visit, Mrs. Glover purchased a microwavable bowl of macaroni and cheese from the vending machine. This commonly sold meal comes in its own microwavable bowl / packaging. The instructions state to add water and place in the microwave to cook, then add the cheese and stir. Like soup, it must be heated in a bowl like container. After her purchase, Defendant William Hokanson arbitrarily ordered Mrs. Glover to empty the uncooked noodles, cheese, and water onto a paper plate before she would be able to place it in the microwave to cook. Mrs. Glover explained that this is not how this item is cooked, referencing the directions and stated that she has cooked it in the microwavable bowl on several previous visits. She explained there was no other way to cook the macaroni and

cheese and if she did what he ordered her son would be eating particles of the paper plate. Defendant Hokanson responded that he did not care. Mrs. Glover pointed to the signs on the vending machine and requested to speak to shift command.

130. Shortly after, Hokanson ordered Mr. Glover out of the visiting room and stated to Mr. Glover "since you want to engage in protected conduct let's see how a DDO works out for you." Mr. Glover asked why he would receive a ticket because he had not disobeyed any direct orders. Hokanson responded "you'll see smart ass. I can care a fuck less about your protected conduct or the court. I'm already on a two-year probation with four months to go." He then walked away from Mr. Glover toward Defendant Captain Sheryl Bailey who twice told Hokanson "I got your back."

131. Mr. Glover asked Defendant Bailey if his visit was being terminated. She said it was being terminated because of the issue with the macaroni and cheese and Hokanson said that Mr. Glover has disobeyed his orders to dump out the food. Mr. Glover told Defendant Bailey that this order was given to Mrs. Glover and that the policy states Mr. Glover, as a prisoner, is not allowed to dump food onto plates. Defendant Bailey told Mr. Glover to "take it up with the hearings officer, the camera doesn't have video so its your word against his." Mr. Glover reiterated his request to see a supervisor and told Defendant Bailey that

Hokanson was doing this out of retaliation. She responded, "prove it," with a smirk on her face. She continued to tell Mr. Glover that if he and Mrs. Glover don't do what they say, this will happen every time.

132. Hearing Officer Defendant Ale Schneider held a hearing on the ticket Hokanson gave Mr. Glover regarding the macaroni and cheese. After hearing Mr. Glover's side of the story, and learning of this retaliation and harassment by Hokanson, Schneider still found him guilty, and ordered a 21-day loss of privileges, "LOP", as punishment. Not only did Defendant Schneider find his guilty on this baseless ticket, he failed to intervene in the unlawful retaliation that he knew Mr. Glover was experiencing. As an officer he had the duty to intervene in constitutional violations. Mr. Glover appealed the determination. Upon information and belief, another inmate who was found guilty of sexual misconduct in the visiting room was given only a 14-day loss of privileges, far less than Mr. Glover for a legitimate and far more serious infraction.

133. Richard Russell reversed the guilty finding and had the misconduct violation expunged from Mr. Glover's files. The same day Richard Russell reversed the guilty ticket from Mr. Glover's record, Mr. Glover was given a security classification for the purpose of a transfer.

134. Before the charge was reversed and expunged, Defendant Hokanson came to Mr. Glover's unit to harass and retaliate against Mr. Glover. Upon his

arrival in the unit, Hokanson tried to get the unit officer to write a misconduct ticket on Mr. Glover for being out of his cell while he was on LOP. The officer informed Defendant that Mr. Glover had his permission and authorization to be out of his cell at that time. Defendant Hokanson threatened to write up the officer and give Mr. Glover a ticket himself. The officers proceeded to have a big argument on the base in front of all the prisoners. Mr. Glover filed an administrative notice with the inspector's office and a grievance. Upon information and belief, Defendant Hokanson was then ordered to stay out of D-Unit.

135.   Soon after, while on a visit, Defendant Hokanson approached Mr. Glover and asked for his "lock," his housing information. Out of fear from Defendant Hokanson's past actions, Mr. Glover silently pointed to his ID card where his lock information was clearly visible. Defendant Hokanson then stated her was "going to write his ass a DDO." Defendant Hokanson and Knapp then wrote Mr. Glover a ticket.

136.   After writing the ticket, Defendants taunted the Glovers asking if "they would request an investigation into this ticket too," "I want them gone, they're a pain in the ass," "Once they're gone, the visits can go back to normal." Knapp then stated to Hokanson, "I got your back, whatever you need me to do brother."

137.   Mr. Glover filed a grievance.

138.   This frivolous ticket was also dismissed.

139.   Mrs. Glover had sent mail to Mr. Glover. She sent some MDOC policy statements. Defendant Lindsey told Mrs. Glover she could mail the policies to Mr. Glover. Notwithstanding that the mail was permissible and not against policy, as it was specifically permitted by the Warden, the Glover's mail was rejected by Defendant Madery, Norder, and Rogers. Defendant Pazitka upheld the baseless rejection.

140.   On 8/14/18, Defendant Rivas told Mr. Glover to pack his belongings because he was being transferred to ARF. Mr. Glover immediately called his wife to inform her of his impending transfer. Mrs. Glover then called the office of the Director of Prisoners, Heidi Washington. Shortly after, advised Mr. Glover was advised that the transfer had been canceled.

141.   On 8/22/18, while on a visit, Defendant Hokanson refused to sit the Glovers near the toy section in the visiting room. This was done intentionally and out of spite to keep Mr. Glover's son from accessing the toys and where Mrs. Glover had just had foot surgery and could not walk back and forth to the toy area. The Glovers requested to speak with shift command but were refused. They were told they needed to terminate their visit in order to speak with shift command. Because the visit had become too painful for Mrs. Glover, the Glovers were forced to terminate the visit. On his way back to his unit, Mr. Glover

explained the situation to a sergeant in the control room. The sergeant said Hokanson can sit them wherever he wanted and sent Mr. Glover back to his unit.

142.   Shortly after, the sergeant had Mr. Glover summoned to the control center and apologized to Mr. Glover about the incident in the visiting room. He stated that they reviewed the camera and determined Hokanson was wrong and that he would be removed from the visiting room for the rest of the evening and reassigned to the front gate.

143.   Upon information and belief, officers had reported Hokanson to Defendant Bailey because Hokanson was a "monster" and should not be working for the department. Upon information and belief, Hokanson had a lot of friends who worked at a level one facility and planned to get his justice on Mr. Glover by having a weapon placed in his area of control where the cameras could not see in the cubes.

144.   Defendant Nicole Pitcher denied Mr. Glover a visit with his criminal defense attorney. Defendant Pitcher gave several false excuses why his attorney could not visit. Mr. Glover filed a grievance which was denied.

145.   On 4/10/19, while on a visit, Defendant Hokanson, now permitted back in the visiting room, once again demanded Mr. Glover remove the packaging from food immediately after purchase. Knowing the policies, Mr. Glover requested to speak to a supervisor. A Lieutenant came to the visiting room,

reviewed the rules/memo, and explained to Defendant Hokanson and Moses that Mr. Glover was correct. Upon being told he was wrong, Defendant Hokanson got upset and went to Defendant Howard to complain.

146. On 4/15/19, Mr. Glover approached Defendant Michelle Parsons concerning funds not being processed and placed into his account, so he could make a call to his attorney. Defendant Parsons did nothing in response, even though the funds were being held up because of her not checking her mail box. Mrs. Glover then sent a complaint via email to the Resident Unit Manager who immediately came to investigate and spoke with Defendant Parsons, as well as to Officer Hammond, who verified the allegation that Defendant Parsons did not regularly check her mail box.

147. Shortly after, Defendant Parsons had Mr. Glover moved out of the unit and changed his security classification level to level one. Defendant Parsons proceeded to tell Mr. Glover that she is prejudiced against prisoners in general, that the prisoners already have too many rights and that the guards can drag their feet as they please. She continued to carry on and explicitly told Mr. Glover would never be her equal because of the color of his skin, because he is black.

148. Defendant Tiffany Kisor knew Richard had complained about Defendant Parsons and did not like it. In response, Defendant Kisor approved the security change in order for Mr. Glover to be placed in level one.

149.    Out of fear of further retaliation in level one, based on what Mr. Glover learned would happen to Mr. Glover in level one, he would be set up with weapons by friends of Hokanson, Mr. Glover refused to go to level one. He was then placed in segregation and written a misconduct ticket.

150.    While in segregation, Mr. Glover experienced extreme depression and was unable to eat. He was placed in a cell that did not have access to drinkable water. Mr. Glover was in segregation for three days.

151.    Upon information and belief, and according to officers at JCF, Parsons moved Mr. Glover because of the complaint filed by Mrs. Glover about Parsons and the funds not getting to Mr. Glover's account. Mr. Glover was advised to stay in segregation in order to not receive more tickets.

152.    On 7/19/2019, when Mrs. Glover was at the facility for a visit, she complained to Defendant Hill about the gate officer's discriminatory conduct to her. In response, Defendant Hill harassed and threatened Mr. and Mrs. Glover during their visit and threatened to terminate the visit. Mr. Glover filed a grievance for Hill's harassment.

153.    Mr. Glover was interviewed by Anderson on the grievance against Defendant Hill. Anderson attempted to get Mr. Glover to sign off of the grievance and Mr. Glover refused to retract his grievance.

154. Throughout this time, the mailroom Defendants have continued to reject and deny mail sent by Mrs. Glover to Mr. Glover. Mrs. Glover contacted various people in administration and explained the continuous retaliation and refusal of the mail room to give Mr. Glover his mail. She explained the unequal treatment and missing mail and that only after Mrs. Glover makes complaints is the mail ever given to Mr. Glover and sometimes it is just rejected under false reasons that are not in policy.

155. On 9/3/19, while on a visit, Defendant Hill approached Mr. and Mrs. Glover and said, "since you refused to sign off on the grievance, I'm going to show you harassment, I'm going to make your life a living hell while you're in the visiting room."

156. On 7/25/19, Mr. Glover was attempting to access his top bunk while utilizing the chair provided and approved by MDOC personnel and JCF facility. The chair was not designed as a step stool for which MDOC permitted it to be used and as a result, Mr. Glover fell off of the chair and sustained a serious head injury. The head injury was so severe it caused Mr. Glover to suffer from a seizure and to continue to suffer from seizures. Mr. Glover had never experienced a seizure prior to this incident. In addition to the seizures, Mr. Glover suffered a concussion and serious back injury from the fall. Mr. Glover was taken to Henry Ford Hospital.

157.    When Mr. Glover returned from the hospital, he was sent to healthcare. While in healthcare, Defendant Russell advised Mr. Glover that he would not be provided with any of the medications, details, or equipment prescribed by Henry Ford for his injuries. He refused to provide the bottom bunk detail for Mr. Glover, requiring him to climb back on the top bunk.

158.    Mr. Glover sent a healthcare request for the prescribed medication but did not receive any resolution. Mr. Glover was eventually provided a walker and a wheelchair.

159.    On 7/28/19, Defendants Sgt. Reynolds, Demps, Freymuth and Snyder, took Mr. Glover's walker and wheelchair from him while on a visit. Mr. Glover requested to see a Lieutenant, but Defendant Demps denied his request. Freymuth called Mr. Glover a cry baby and threatened to write Mr. Glover a ticket for assault and throw him into segregation if he were to fall on Freymuth from lack of balance.

160.    Mrs. Glover had found a captain to return Mr. Glover's walker and permit Mr. Glover to go to healthcare after the visit. After the visit healthcare would not accept Mr. Glover and Defendant Snyder took away his walker again.

161.    Mr. Glover asked Defendant Anderson why he was being treated in this manner and Defendant insinuated that it was still out of retaliation for the Glover's protected conduct.

162.   The next day, Mr. Glover was wheeled to healthcare and saw a Dr. Victoria Hallett. He was then issued the appropriate medical detail for a bottom bunk, a wooden cane, a wheelchair, extra towels, ice and medicine. She refused to permit Mr. Glover the muscle relaxer prescribed from the hospital stating that he did not need it.

163.   Defendant Hokanson then took Mr. Glover's medicine for no lawful reason, preventing him from taking his medication. Defendants Anderson and Iosefa refused to allow Mr. Glover to have the medication and Iosefa cussed out Mr. Glover in front of other visitors.

164.   A few days later, Mr. Glover had a meeting with Jackson College staff, as he had been able to take classes again. When Mr. Glover arrived at the school in his wheelchair with his pusher, Defendant Rivas confronted him and ordered his pusher to stop pushing him and to go back to the unit. Mr. Glover was not able to attend the meeting. Mr. Glover filed a grievance on Rivas.

165.   The next day, Mr. Glover was in extreme pain, suffering from blurred vision and dizziness. His housing unit officer called healthcare and described his situation. Defendants Nurses Brown and Bills refused to see Mr. Glover stating his condition was not urgent enough.

166.   A few days later, when Mr. Glover went to the school, Defendant Rivas and Defendant Marsh refused to allow him to use the elevator to access his class

on the second floor. This was in response to Mr. Glover's grievance where other inmates who did not have injuries were allowed to use the elevator.

167. As a result of these incidents, and in response to his grievance, Defendant had written Mr. Glover two misconduct tickets. Defendant DeMyers and Rennells reviewed the misconducts and Mr. Glover explained the retaliation and treatment from Rivas, his medical condition, that he used a cane and was unable to walk up and down 30 stairs while carrying his books. He explained how there were so many other inmates who use the elevator who did not have any injury. Defendant Rennells then threatened to take Mr. Glover to segregation and write him a ticket if he did not remove the hospital band that said "fall risk" and proceeded to cut it off, claiming it was contraband. Defendants found him guilty and gave him 30 days LOP.

168. Mr. Glover was then sent to segregation. While in segregation, Mr. Glover spoke to Defendant Sergeant Nevins and advised him of the retaliation. Defendant Nevins told him that since he wanted to follow policy, he had shit coming. Nevins released Mr. Glover from segregation and said he couldn't go to segregation to be away from his staff. Defendant Nevins instructed another officer to write Mr. Glover a misconduct ticket about his clothes, his state issued clothes. The ticket was dismissed.

169.    While leaving segregation, Mr. Glover passed out. He was taken to healthcare in a wheelchair. While in healthcare, Defendant Brown aggressively pinched him and made him stand continuously, despite Mr. Glover's complaints that he still felt light headed. Defendant Brown told Mr. Glover he was faking, and did not provide any treatment.

170.    On 8/13/19, Mr. Glover passed out on third shift during the night and was found unresponsive by his cellmate. Healthcare checked his vitals and instructed staff to place him back in his bed. When he woke up, facing the other direction, his cell mate and unit officer told him what happened. Later that day, Mr. Glover felt dizzy and began to vomit before passing out. He was sent to Henry Ford Hospital.

171.    On 8/14/19, Mr. Glover was advised that an unknown nurse had cancelled his doctor's appointment with Dr. Hallett, even though Mr. Glover hadn't see Dr. Hattlet after multiple requests, blackouts, and requests by other staff and hospitalization. He was being forced to walk up flights of stairs, had his medication discontinued on day 3 of 30, and was written numerous misconducts do to this injury. He filed grievances and Mrs. Glover filed complaints and continued to suffer from pain, headaches, blurred vision and more.

172.    After complaints from Mrs. Glover to MDOC medical personnel, Mr. Glover was seen by Defendant Hattlet. She summoned him to healthcare on

8/20/19. Defendant Hattlet then proceeded to violate Mr. Glover by shoving her finger in his anus with the intent to abuse him. He told her he was not comfortable and that it was not related to his injuries. She said if Mr. Glover refused she would write in his medical record that he was refusing treatment. Mr. Glover was forced to comply. The penetration was painful and not done for a legitimate medical reason. Mr. Glover experienced pain and blood from his anus. Her abuse has caused his extreme mental distress.

173. Mr. Glover filed a PREA grievance. Mr. Glover's grievance was denied, citing insufficient evidence. Mr. Glover was given a four-minute interview. Mr. Glover appealed this denial, and the denial was affirmed.

174. Mr. Glover still uses and has a detail for his cane, as the result of his medical condition. Defendant Hokanson continues to retaliate and has refused to allow Mr. Glover to sit at the handicapped table in the chow hall. Because Mr. Glover cannot fit in the regular seating with his cane, he is unable to eat in the chow hall. Both Mr. and Mrs. Glover have filed numerous complaints and grievances to no avail.

175. Mrs. Glover is continuously harassed and retaliated when she visits Mr. Glover. On 11/10/19, Mrs. Glover recently visited Mr. Glover. MDOC staff forced Mrs. Glover to wait in the lobby for approximately two hours before they permitted her to have her visit with her husband. Defendants Hill, Brooks,

Hokanson, Iosefa, Cooley, Delossantos, and McElroy have been harassing Mrs. Glover and retaliating against her by giving her a hard time when she comes to visit Mr. Glover, including making her wait unnecessarily with their small child, threatening to terminate visits in response to requests to see a supervisor.

176. While Mr. Glover filed numerous grievances, Mrs. Glover filed several complaints about Defendants conduct. The Glovers have filed complaints and sought help from each of the Warden Defendants, Brewer, Lindsey and Nagy, to no avail. The retaliation has not stopped.

177. Several corrections officers told Mr. Glover that they knew what was going on between the Glovers, Rivas, and the administrators of the facility. Officers told Mr. Glover that other officers and supervisory staff were retaliating against him and his wife for grievances and complaints, but not to backdown. The Glover's were "ringing bells" up the administration by attempting to vindicate their rights. At least one officer was punished for telling Mr. Glover he was being retaliated against. Ever since Mrs. Glover reported Defendant Rivas' groping and unreasonable actions, and the continued harassment my JCF staff, Mr. and Mrs. Glover and R.G. had been victims of a coordinated plan of retaliation for their constitutionally protected conduct.

**COUNT I**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983**
**Fourth Amendment – Unreasonable Search**

**(Mrs. Glover and R.G. v. Defendant Rivas)**

178.    Plaintiff incorporates herein all prior allegations.

179.    The Fourth Amendment prohibits unreasonable searches of citizens.

180.    At all times relevant herein, Defendant Rivas was acting under the color of law and was required to obey the laws of the United States.

181.    While conducting the pat down, Defendant Rivas aggressively groped Mrs. Glover's breasts, and her inner thighs/genital area.

182.    A reasonable search does not include conduct that equate to sexual assault, i.e. groping of breasts and genital areas.

183.    Defendant Rivas's pat down of Mrs. Glover exceeded a reasonable search and was done in response to Mrs. Glover's request to see shift command.

184.    After groping Mrs. Glover, Defendant Rivas required a strip search of baby R.G. Mrs. Glover was required to remove all of R.G's clothing in an open space so that Rivas could watch Mrs. Glover change her son's diaper.

185.    Rivas proceeded to require Mrs. Glover to hold R.G. out in plain view completely naked and exposed.

186.    Strip searching R.G. is against policy and exceeded a reasonable search and was done in response to his mother's request to see shift command.

187.    Mrs. Glover filed a complaint about Defendant Rivas's conduct.

188.   Upon information and belief, Defendant Rivas was reassigned to a different position as a result of Plaintiffs' complaint.

189.   Defendant intentionally groped Mrs. Glover during her pat down and far exceeded a reasonable search when Defendant intentionally subjected R.G. to a strip search without any justification. This was done to Plaintiffs without consent, probable cause, legal justification, just cause, or any other legally valid reason.

190.   Defendant Rivas actions constituted a violation of Mrs. Glover and R.G.'s right to be free from unreasonable searches in violation of 42 U.S.C. § 1983 and the right under the Fourth Amendment to the United States constitution to be free from unreasonable searches.

191.   As a proximate result of the illegal and unconstitutional acts of the Defendant, Mrs. Glover and R.G. were harmed and suffered damages for her mental and emotional injury and pain, mental anguish, humiliation, and embarrassment.

### COUNT II
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### First Amendment – Retaliation for Protected Conduct

### (Mrs. Glover & R.G. v. Defendant Rivas)

192.   Plaintiff incorporates herein all the prior allegations.

193.  The First Amendment prohibits retaliation for protected speech or conduct.

194.  At all times relevant herein, Defendant Rivas was acting under the color of law and was required to obey the laws of the United States.

195.  Mrs. Glover engaged in constitutionally protected conduct when she asked to speak with a shift command officer when Defendant Rivas refused to allow Mrs. Glover to bring R.G.'s baby blanket and bottle into the visit, despite her previous approval.

196.  In retaliation for Mrs. Glover's protected conduct, Defendant Rivas intentionally, knowingly, maliciously, recklessly, unreasonably, and/or gross negligently groped Mrs. Glover and performed and unreasonable strip search of her infant son, R.G.

197.  Such retaliation would serve as a determent to a person of ordinary firmness from engaging in such protected conduct.

198.  The retaliation was motivated at least in part by the protected speech.

199.  There was a causal connection between Plaintiff's constitutionally protected conduct and the adverse retaliatory actions taken by Defendant against Plaintiffs.

200.  Defendant intentionally groped Mrs. Glover during her pat down and far exceeded a reasonable search when Defendant intentionally subjected R.G. to

a strip search without any justification. This was done to Plaintiffs without consent, probable cause, legal justification, just cause, or any other legally valid reason.

201. As a proximate result of the illegal and unconstitutional acts of the Defendant, Mrs. Glover and R.G. were harmed and suffered damages for their mental and emotional injury and pain, mental anguish, humiliation, and embarrassment.

## COUNT III
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### First Amendment – Retaliation for Protected Conduct

**(Mr. Glover v. Defendant Lindsey, Brewer, Smith, Nagy, Howard, Gordon, Napier, Blair, Purdy, Salinas, McCumber-Hemry, Schneider, Bailey, Anderson, Muzzin, Utter, Pazitka, Doss, Crane, Hokanson, Kennedy, Kik, Knapp, Moseley, Rivas, Sierminski, Thelen, Madery, Norder, Rogers, Lashley, Hill, King, Demps, Pitcher, McCumber-Hemry, DeMeyers, Rennells, Nevins, Iosefa, DeMyers, Rennells, Marsh, Snyder)**

202. Plaintiffs incorporates herein all the prior allegations.

203. The First Amendment prohibits retaliation for protected speech or conduct.

204. At all times relevant herein, Defendants were acting under the color of law and were required to obey the laws of the United States.

205. Mr. Glover engaged in constitutionally protected conduct when he wrote grievances on Defendants for the conduct described herein.

206. Mrs. Glover engaged in constitutionally protected conduct when she requested to see supervisors and filed complaints with JCF and MDOC administration regarding the conduct of Defendants as described herein.

207. Upon information and belief, Defendants were aware of Mr. Glover's protected conduct. Many Defendants and officers explicitly told Mr. Glover that he was being treated this way because of his and his wife's protected conduct. Further Defendants were aware that this protected conduct was "ringing bells" with administration and that Mr. Glover had a target on his back.

208. In retaliation for the Glover's protected conduct, Defendants intentionally, knowingly, maliciously, recklessly, engaged in a coordinated plan of retaliation against Mr. Glover including but not limited to:

    a. Threatening to terminate visits;

    b. Terminating visits;

    c. Transferring Mr. Glover to the Upper Peninsula;

    d. Failing to Intervene in constitutional violations and retaliations of other corrections officers and supervisory staff;

    e. Harassing Mr. Glover's wife, forcing her to expose her breasts in order to visit Mr. Glover;

f.  Arbitrarily denying Mr. Glover's wife from bringing baby items in the visiting room, despite permitting other babies and mothers to have these items;

g.  Putting Mr. Glover in segregation, in "the hole" for no reason;

h.  Threatening to write misconduct tickets for no basis;

i.  Writing false misconduct tickets;

j.  Continuously shaking down his cell and possessions;

k.  Stealing his property including declarations and other legal papers;

l.  Arbitrary refusal to follow MDOC written policies;

m.  Intentional harassment;

n.  Failure to protect from continued harassment and retaliation;

o.  Denying access to grievance forms, altering / falsifying information, rejecting grievances against policy;

p.  Rejecting and mail and JPay messages against policy;

q.  Removing tracking numbers from mail;

r.  Threats of continued harassment for protected conduct;

s.  Reclassifying security level to transfer Mr. Glover;

t.  Confiscating medical equipment and medications;

u.  Sexual assault;

v.  Refusal to treat serious medical needs;

209.   Such retaliation would serve as a determent to a person of ordinary firmness from engaging in such protected conduct.

210.   The retaliation was motivated at least in part by the protected speech.

211.   There was a causal connection between Plaintiff's constitutionally protected conduct and the adverse retaliatory actions taken by Defendant against Plaintiff.

212.   As a proximate result of the illegal and unconstitutional acts of the Defendants, Mr. Glover was harmed and suffered damages for his mental and emotional injury and pain, mental anguish, humiliation, and embarrassment.

**COUNT IV**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983**
**Fourteenth Amendment – Denial of Access to Courts**

**(Mr. Glover v. McCumber-Hemry, Crane, Pitcher)**

213.   Plaintiff incorporates herein all the prior allegations.

214.   Defendant Crane refused to provide a grievance form to Mr. Glover.

215.   Defendant McCumber-Hemry intentionally mislabeled Plaintiff's grievance forms so they would not be investigated and exhausted.

216.   Plaintiff cannot bring any litigation in court without filing grievances and exhausting remedies.

217.   Defendants refusal to provide and process the grievance forms according to MDOC policy deprived Mr. Glover of his right to access the courts.

# COUNT V
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### Eighth Amendment – Deliberate Indifference to Serious Medical Need

### (Mr. Glover v. Hallett, Iosefa, Reynolds, Freymuth, Demps, Snyder, Brown, Bills, Rivas, DeMeyers, Rennells, Marsh)

218.   Plaintiff incorporates herein all prior allegations.

219.   At all times relevant herein, Plaintiff had a clearly established right to be free from deliberate indifference to his serious medical needs under the Eighth Amendment to the United States Constitution.

220.   At all times relevant, Defendants were acting under the color of law and were required to obey the laws of the United States.

221.   At all times relevant, Defendants knew Plaintiff had a serious medical need where he was severely injured, required a walker and wheelchair, and had been experiencing seizures and blackouts.

222.   Defendants Reynolds, Freymuth, Demps and Snyder confiscated his wheelchair and walker for no medical reason, forcing him to walk in extreme pain.

223.   Defendants Rivas and Marsh prevented Mr. Glover from using the elevator when he had a detail for a wheelchair and walker and forced him to walk painfully up and down 30 stairs.

224.   Defendant Russell and Hallet refused to provide medications, medical equipment or medical details proscribed by Henry Ford Hospital after Mr. Glover was first injured.

225.   Defendant Hokanson confiscated Mr. Glover's medication and would not permit him to take the medication.

226.   Defendant Brown aggressively pinched Mr. Glover and forced him to stand after he passed out and was complaining of being lightheaded. She told him he was faking it and refused to treat his blackout or lightheadedness.

227.   Defendants DeMeyers and Rennells failed to intervene and acquiesced as supervisors when Defendant Rivas and Marsh refused to allow Mr. Glover to use the elevator despite their knowledge that Mr. Glover had a serious medical need and was in pain.

228.   Defendants actions and inactions constituted deliberate indifference to a serious medical need in violation of 42 U.S.C. § 1983 and his rights under the Eighth Amendment to the United States constitution to be free from cruel an unusual punishment.

229.   As a proximate result of the illegal and unconstitutional acts of the Defendants, Mr. Glover was harmed and suffered damages for his mental and emotional injury and pain, mental anguish, humiliation, and embarrassment.

## COUNT VI
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983

## Eighth Amendment – Cruel and Unusual Punishment

## (Mr. Glover v. Dr. Hallett)

230.    Plaintiff incorporates herein all prior allegations.

231.    At all times relevant herein, Plaintiff had a clearly established right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

232.    At all times relevant herein, Defendant was acting under the color of law and was required to obey the laws of the United States.

233.    Defendant Hallet penetrated Mr. Glover without consent and without a medical basis. Her actions caused Mr. Glover to bleed and experience pain in his anus and well as extreme mental distress from the violation.

234.    Defendant Hallet sexually assaulted Plaintiff.

235.    Prison inmates are constitutional protected from sexual assault as part of their sentence.

236.    Defendant Hallet's actions constituted a violation of Plaintiff's right to be free from cruel and unusual punishment in violation of 42 U.S.C. § 1983 and his rights under the Eighth Amendment to the United States constitution to be free from cruel and unusual punishment.

237. As a proximate result of the illegal and unconstitutional acts of the Defendant, Mr. Glover was harmed and suffered damages for his physical, mental and emotional injury and pain, mental anguish, humiliation, and embarrassment.

### COUNT VII
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### First Amendment – Retaliation for Protected Conduct

**(Mrs. Glover and R.G. v. Defendants Sierminski, Brooks, Delossantos, McElroy, Hill, Cooley, Hokanson, Napier, Lindsey, Rickman, Iosefa)**

238. Plaintiffs incorporates herein all the prior allegations.

239. The First Amendment prohibits retaliation for protected speech or conduct.

240. At all times relevant herein, Defendants were acting under the color of law and were required to obey the laws of the United States.

241. After the first incident with Defendant Rivas and Gordon, Mrs. Glover engaged in constitutionally protected conduct when she continued to request to see supervisors when she experienced harassment and retaliation at the facility, when she complained about Defendants mistreatment of Mr. Glover, and when she filed numerous complaints with JCF and MDOC administration regarding the conduct of Defendants as described herein.

242. In retaliation for Mrs. Glover's protected conduct, Defendants intentionally, knowingly, maliciously, recklessly, retaliated against Mrs. Glover and R.G. including but not limited to:

a. Transferring Mr. Glover to the Upper Peninsula to prevent visits;

b. Harassing Mrs. Glover on visits;

c. Threatening to terminate visits and Mrs. Glover's visitor privileges;

d. Intentionally misapplying of MDOC policies in unequal and arbitrary manner;

e. Forcing Mrs. Glover to strip search her son and hold him out in the open for no reasonable basis;

f. Forcing Mrs. Glover to expose her breasts;

g. Making Mrs. Glover and R.G. wait in the lobby for two hours before staff would process her visit;

h. Preventing Mrs. Glover and R.G. from bringing in baby items like a bottle and blanket, despite permitting others to bring in the same items;

i. Threatening to cancel visits in response to requests to see a supervisor or requests that policies be followed by JCF staff;

j. Intentionally sitting the Glovers away from the toys in the visiting room when other families with small children are permitted to sit by the toys;

k. Forcing R.G. to sit in a dirty diaper for one and a half hours because Rickman refused to permit a diaper change;

l. Tampering with and wrongfully rejecting mail Mrs. Glover sends to Mr. Glover;

m. Intentionally treating Mrs. Glover and R.G. differently than other similarly situated visitors without any rational basis for the difference;

n. Failing to intervene in the retaliation against Mrs. Glover and R.G.;

243. Such retaliation would serve as a determent to a person of ordinary firmness from engaging in such protected conduct.

244. The retaliation was motivated at least in part by the protected speech.

245. There was a causal connection between Plaintiff's constitutionally protected conduct and the adverse retaliatory actions taken by Defendant against Plaintiffs.

246. As a proximate result of the illegal and unconstitutional acts of the Defendants, Mrs. Glover and R.G. were harmed and suffered damages for her mental and emotional injury and pain, mental anguish, humiliation, and embarrassment.

## COUNT VIII
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### Fourteenth Amendment – Equal Protection

**(Mrs. Glover and R.G. v. Defendants Sierminski, Brooks, Delossantos, McElroy, Hill, Cooley, Hokanson, Napier, Lindsey, Rickman, Iosefa)**

247. Plaintiffs incorporates herein all prior allegations.

248. At all times relevant herein, Plaintiffs had a clearly established right to be free from the state and state actor's intentionally different treatment from

others who are similarly situated without a rational basis pursuant to the Equal Protection Clause of the Fourteenth Amendment.

249. At all times relevant herein, Defendants were acting under the color of law and were required to obey the laws of the United States.

250. Defendant intentionally treated Plaintiffs different than other similarly situated visitors by, but not limited to, the following:

a. Preventing Mrs. Glover and R.G. from bringing in baby items like a baby bottle, milk, and blanket while letting other families bring in these items on visits;

b. Preventing Mrs. Glover from visiting due to her "clothes" even though her clothes were no different than other visitors and did not violate any MDOC policies and she had worn the same outfit on several occasions;

c. Forcing Mrs. Glover to undergo searches that are not performed on other visitors;

d. Intentionally sitting the Glovers away from the toys in the visiting room when other families with small children are permitted to sit by the toys;

e. Harassing Mrs. Glover on visits and not harassing other visitors;

f. Threatening to terminate visits and Mrs. Glover's visitor privileges but not to other visitors;

g. Intentionally misapplying of MDOC policies in unequal and arbitrary manner.

h. Failing to intervene in the arbitrary and irrational treatment of Mrs. Glover and R.G.

251. Defendants had no rational basis to treat Mrs. Glover and R.G. differently than other visitors.

252. As a proximate result of the illegal and unconstitutional acts of the Defendants, Mrs. Glover and R.G. were harmed and suffered damages for her mental and emotional injury and pain, mental anguish, humiliation, and embarrassment.

**COUNT IX**
**VIOLATION OF CIVIL RIGHTS UNDER**
**42 U.S.C. § 12101 & 29 U.S.C. § 791**
**Discrimination in Violation of Americans with Disabilities Act and Rehabilitation Act**

**(Mr. Glover v. MDOC)**

253. Plaintiff incorporates herein all prior allegations.

254. The ADA and RA prevent discrimination based on disability.

255. As a result of Plaintiff's fall and subsequent seizures and injury, Plaintiff is now disabled.

256. MDOC, by and through its officers named herein, have discriminated against Mr. Glover on the basis of his disability by, including but not limited to:

a. Refusing to allow Mr. Glover to use the elevator in order to attend his classes on the second floor of the school;

b. Refusing to allow Mr. Glover to sit at the handicapped table in the chow hall.

257.  As a proximate result of the illegal and unconstitutional acts of the Defendants, Mr. Glover was harmed and suffered damages for his mental and emotional injury and pain, mental anguish, humiliation, and embarrassment.

## COUNT X
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### Conspiracy to Deprive of Rights

### (Plaintiffs v. Defendants)

258.  Plaintiffs incorporates herein all prior allegations.

259.  At all times relevant, Plaintiffs had a clearly established right to be free from conspiracy to violate their constitutional right to be free from retaliation for engaging in protected conduct.

260.  At all times relevant herein, Defendants were acting under the color of law and were required to obey the laws of the United States.

261.  Defendants agreed to retaliate against Plaintiffs for their engagement in protected conduct.

262.  Defendant Officers actions and inactions constitute an impermissible conspiracy to deprive an individual of their rights to be free from bodily harm in

violation of 42 U.S.C § 1983 and the Fourteenth Amendment to the United States Constitution.

263.  As a proximate result of the illegal and unconstitutional acts of the Defendants, Plaintiffs were harmed and suffered damages for their physical, mental, emotional injury and pain, mental anguish, humiliation, and embarrassment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Richard Glover, Tina Glover, and R.G., demand judgment and prays for the following relief, jointly and severally, against all Defendants:

a. Full and fair compensatory damages in an amount to be determined by a jury;

b. Punitive damages in an amount to be determined by a jury;

c. Reasonable attorney's fees and costs of this action; and

d. Any such other relief as appears just and proper.

## JURY DEMAND

Plaintiffs hereby demands a trial by jury of all triable issues, per Fed. R. Civ. P. 38(b).

Respectfully submitted,

EXCOLO LAW, PLLC

Dated: November 18, 2019    By:    _/s/ Solomon M. Radner_
Solomon M. Radner (P73653)
Madeline M. Sinkovich (P82846)
Attorneys for Plaintiff
26700 Lahser Road, Suite 401
Southfield, MI 48033
(866) 939-2656
sradner@excololaw.com