# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

RICHARD GLOVER; TINA GLOVER, on her own and on behalf of her son R.G, a minor,

        *Plaintiffs*,

v.

MONICA RIVAS; GREGORY GORDON; JENNIFER SIERMINSKI; DOUGLAS SMITH; JEREMY HOWARD; SHAWN BREWER; KEVIN LINDSEY; NOAH NAGY; KIMBERLY NAPIER; KARINA BLAIR; JOEL SALINAS; SHERYL BAILEY; PAUL ANDERSON; WILLIAM HOKANSON; MICHAEL KENNEDY; CHRIS KNAPP; MARVIN MOSELEY; JACQUELYN THELEN; BRIAN MADERY; GORDON HILL; NE'TESHA DEMYERS; VICTORIA HALLET; JAMES KING; DENNIS REYNOLDS; OFFICER SNYDER; CRYSTAL BROWN; WILLIAM MARSH; LINNIE BROOKS; SAMUEL DELOSSANTOS; TARHAKA MCELROY; MARK WINTERS; TIMOTHY SCHUBRING; SCOTT BAILEY; NATHAN ROOT; RUSSELL RURKA; DEVIN FREYMUTH; MICHELLE PARSONS; TIFFANI KISOR; MAJOR WASHINGTON; SIRENA LANDFAIR; DIONE WRIGHT; SHARITA DAVIDSON; CHRISTINE MCCUMBER-HEMRY; HEIDI WASHINGTON; KENNETH MCKEE; and FREDERICK HERRO,

        *Defendants*,

Case No. 2:19-cv-13406

Hon. Terrence G. Berg

1

---

EXCOLO LAW, PLLC
Solomon M. Radner (P73653)
Madeline M. Sinkovich (P82846)
*Attorneys for Plaintiff*
26700 Lahser Road, Suite 401
Southfield, MI 48033
(866) 939-2656
sradner@excololaw.com
msinkovich@excololaw.com

---

## FIRST COMPLAINT AND JURY DEMAND

Plaintiffs, Richard Glover, Tina Glover, and R.G., by and through their attorneys, EXCOLO LAW, PLLC, complaining of Defendants, respectfully allege as follows:

## JURISDICTION AND VENUE

1.    This is a civil rights action in which the Plaintiffs seek relief for the violation of their rights secured by 42 U.S.C. § 1983, the First Amendment, Fourth Amendment, Eighth Amendment, Fourteenth Amendment, 42 U.S.C. § 12101 and 29 U.S.C. § 791.

2.    Jurisdiction of this Court is found upon 28 U.S.C. § 1331 since this action arises under the Constitution and laws of the United States.

3.    Venue is proper in the United States District Court for the Eastern District of Michigan because the majority of the events complained of occurred at G. Robert Cotton Correctional facility in Jackson, Michigan.

4. Plaintiff Richard Glover has complied with all respects of the Pre-Exhaustion Requirements of the Prison Litigation Reform Act through the appropriate grievance processes of the MDOC for the grievances upon which this litigation is based.

5. This grievance system is a sham as are the MDOC's so-called investigations. Rarely, if ever, does the MDOC actually find any wrongdoing, no matter how egregious the MDOC's personnel's grieved conduct.

6. Plaintiff Richard Glover has filed repeated detailed grievances addressing the issues raised in this action, and has exhausted all administrative remedies.

## PARTIES

7. Plaintiff, RICHARD GLOVER ("Mr. Glover"), was at all times relevant a prisoner in the custody of the Michigan Department of Corrections ("MDOC").

8. Mr. Glover is currently confined at the G. Robert Cotton Correctional Facility ("JCF"), in Jackson, Michigan.

9. Plaintiff, TINA GLOVER ("Mrs. Glover"), is a citizen of the United States and a resident of the state of Michigan. Mrs. Glover is married to Mr. Glover.

10.    Plaintiff, R.G. ("R.G."), is a minor citizen of the United States and a resident of the state of Michigan. Mr. and Mrs. Glover are the parents of R.G.

11.    Upon information and belief, all individual defendants were at all pertinent times Michigan residents and are being sued in their individual, supervisory capacities, and official capacities as permitted by law.

12.    Defendant, MONICA RIVAS ("Rivas"), was at all times relevant a Michigan resident and a corrections officer at JCF. Defendant Rivas is being sued in her individual capacity for Plaintiffs' constitutional claims. Defendant Rivas is being sued in her official capacity for Plaintiff's claims under the ADA.

13.    Defendant, GREGORY GORDON ("Gordon"), was at all times relevant a Michigan resident and a sergeant corrections officer at JCF. Defendant Gordon is being sued in his individual and supervisory capacity.

14.    Defendant, JENNIFER SIERMINSKI ("Sierminski"), was at all times relevant a Michigan resident and a corrections officer at JCF. Defendant Sierminski is being sued in her individual capacity.

15.    Defendant, DOUGLAS SMITH ("Smith"), was at all times relevant a Michigan resident and the deputy warden at JCF. Defendant Smith is being sued in his individual and supervisory capacity.

16.     Defendant, JEREMY HOWARD ("Howard"), was at all times relevant a Michigan resident and the deputy warden at JCF. Defendant Howard is being sued in his individual and supervisory capacity.

17.     Defendant, SHAWN BREWER ("Brewer"), was at all times relevant a Michigan resident and the Warden at JCF. Defendant Brewer is being sued in his individual and supervisory capacity.

18.     Defendant, KEVIN LINDSEY ("Lindsey"), was at all times relevant a Michigan resident and the warden at JCF. Defendant Lindsey is being sued in his individual and supervisory capacity.

19.     Defendant, NOAH NAGY ("Nagy"), was at all times relevant a Michigan resident and the warden at JCF. Defendant Nagy is being sued in his individual and supervisory capacity for Plaintiffs' constitutional claims. Defendant Nagy is being sued in his official capacity for Plaintiff's claims under the ADA.

20.     Defendant, KIMBERLY NAPIER ("Napier"), was at all times relevant a Michigan resident and the warden's administrative assistant at JCF. Defendant Napier is being sued in her individual and supervisory capacity.

21.     Defendant, KARINA BLAIR ("Blair"), was at all times relevant a Michigan resident and the facility manager at JCF. Defendant Blair is being sued in her individual and supervisory capacity.

5

22.     Defendant, JOEL SALINAS ("Salinas"), was at all times relevant a Michigan resident and the hearing investigator at JCF. Defendant Salinas is being sued in his individual and supervisory capacity.

23.     Defendant, CHRISTINE MCCUMBER-HEMRY ("McCumber-Hemry"), was at all times relevant a Michigan resident and the hearings / grievance investigator at JCF. Defendant McCumber-Hemry is being sued in her individual and supervisory capacity.

24.     Defendant, SHERYL BAILEY ("Bailey"), was at all times relevant a Michigan resident and a captain at JCF. Defendant Bailey is being sued in her individual and supervisory capacity.

25.     Defendant, SCOTT BAILEY ("Scott Bailey"), was at all times relevant a Michigan resident and the Inspector at JCF. Defendant Scott Bailey is being sued in his individual and supervisory capacity.

26.     Defendant, PAUL ANDERSON ("Anderson"), was at all times relevant a Michigan resident and a captain at JCF. Defendant Anderson is being sued in his individual and supervisory capacity.

27.     Defendant, WILLIAM HOKANSON ("Hokanson"), was at all times relevant a Michigan resident and an officer at JCF. Defendant Hokanson is being sued in his individual capacity for Plaintiff's constitutional claims and his official capacity for Plaintiff's claims under the ADA.

6

28.     Defendant, MICHAEL KENNEDY ("Kennedy"), was at all times relevant a Michigan resident and an officer at JCF. Defendant Kennedy is being sued in his individual capacity.

29.     Defendant, CHRIS KNAPP ("Knapp"), was at all times relevant a Michigan resident and an officer at JCF. Defendant Knapp is being sued in his individual capacity.

30.     Defendant, MARVIN MOSELEY ("Moseley"), was at all times relevant a Michigan resident and an officer at JCF. Defendant Moseley is being sued in his individual capacity.

31.     Defendant, JACQUELYN THELEN ("Thelen"), was at all times relevant a Michigan resident and an officer at JCF. Defendant Thelen is being sued in her individual capacity.

32.     Defendant, BRIAN MADERY ("Madery"), was at all times relevant a Michigan resident and a mail room employee at JCF. Defendant Madery is being sued in his individual capacity.

33.     Defendant, GORDON HILL ("Hill"), was at all times relevant a Michigan resident and a sergeant at JCF. Defendant Hill is being sued in his individual and supervisory capacity.

34.     Defendant, JAMES KING ("King"), was at all times relevant a Michigan resident and a resident unit manager at JCF. Defendant King is being sued in his individual and supervisory capacity.

35.     Defendant, NE'TESHA DEMYERS ("DeMyers"), was at all times relevant a Michigan resident and a lieutenant at JCF. Defendant DeMyers is being sued in her individual and supervisory capacity for Plaintiffs' constitutional claims. Defendant DeMyers is being sued in her official capacity for Plaintiff's claims under the ADA.

36.     Defendant, VICTORIA HALLET ("Hallet"), was at all times relevant a Michigan resident and a medical doctor contracted to work at JCF. Defendant Hallet is being sued in her individual capacity for Plaintiffs' constitutional claims. Defendant Hallet is being sued in her official capacity for Plaintiff's claims under the ADA.

37.     Defendant, DENNIS REYNOLDS ("Reynolds"), was at all times relevant a Michigan resident and a sergeant at JCF. Defendant Reynolds is being sued in his individual and supervisory capacity.

38.     Defendant, DEVIN FREYMUTH ("Freymuth"), was at all times relevant a Michigan resident and an officer at JCF. Defendant Freymuth is being sued in his individual capacity.

39.    Defendant, Officer SNYDER ("Snyder"), was at all times relevant a Michigan resident and an officer at JCF. Defendant Snyder is being sued in his individual capacity.

40.    Defendant, CRYSTAL BROWN ("Brown"), was at all times relevant a Michigan resident and a registered nurse at JCF. Defendant Brown is being sued in her individual capacity.

41.    Defendant, WILLIAM MARSH ("Marsh"), was at all times relevant a Michigan resident and an officer at JCF. Defendant Marsh is being sued in his individual capacity for Plaintiffs' constitutional claims. Defendant Marsh is being sued in his official capacity for Plaintiff's claims under the ADA.

42.    Defendant, LINNIE BROOKS ("Brooks"), was at all times relevant a Michigan resident and an officer at JCF. Defendant Brooks is being sued in her individual capacity.

43.    Defendant, SAMUEL DELOSSANTOS ("Delossantos"), was at all times relevant a Michigan resident and an officer at JCF. Defendant Delossantos is being sued in his individual capacity.

44.    Defendant, TARHAKA MCELROY ("McElroy"), was at all times relevant a Michigan resident and an officer at JCF. Defendant McElroy is being sued in her individual capacity.

45.    Defendant, MICHELLE PARSONS ("Parsons"), was at all times relevant a Michigan resident and Area Resident Unit Supervisor (ARUS) at JCF. Defendant Parsons is being sued in her individual capacity.

46.    Defendant, TIFFANI KISOR ("Kisor"), was at all times relevant a Michigan resident and an assistant deputy warden at JCF. Defendant Kisor is being sued in her individual and supervisory capacity.

47.    Defendant, MAJOR WASHINGTON ("Washington"), was at all times relevant a Michigan resident and an Area Resident Unit Supervisor (ARUS) at JCF. Defendant Washington is being sued in his individual capacity.

48.    Defendant, SIRENA LANDFAIR ("Landfair"), was at all times relevant a Michigan resident and the Health Unit Manager at JCF. Defendant Landfair is being sued in her individual and supervisory capacity for Plaintiffs' constitutional claims. Defendant Landfair is being sued in her official capacity for Plaintiff's claims under the ADA.

49.    Defendant, SHARITA DAVIDSON ("Davidson"), was at all times relevant a Michigan resident and a Sergeant at JCF. Defendant Davidson is being sued in her individual and supervisory capacity.

50.    Defendant, DIONE WRIGHT ("Wright"), was at all times relevant a Michigan resident and a medical doctor at JCF. Defendant Davidson is being sued in her individual and supervisory capacity for Plaintiffs' constitutional

claims. Defendant Wright is being sued in her official capacity for Plaintiff's claims under the ADA.

51.     Defendant, RUSSELL RURKA ("Rurka"), was at all times relevant a Michigan resident and the Deputy Warden at JCF. Defendant Rurka is being sued in his individual and supervisory capacity.

52.     Defendant, NATHAN ROOT ("Root"), was at all times relevant a Michigan resident and an Lieutenant at JCF. Defendant Root is being sued in his individual and supervisory capacity.

53.     Defendant, MARK WINTERS ("Winters"), was at all times relevant a Michigan resident and a Sergeant at JCF. Defendant Winters is being sued in his individual and supervisory capacity.

54.     Defendant, TIMOTHY SCHUBRING ("Schubring"), was at all times relevant a Michigan resident and the facility manager at JCF. Defendant Schubring is being sued in his individual and supervisory capacity.

55.     Defendant, FREDERICK HERRO ("Herro"), was at all times relevant a Michigan resident and medical provider / doctor at JCF. Defendant Herro is being sued in his individual capacity.

56.     Defendant, HIEDI WASHINGTON ("Heidi Washington"), was at all times relevant a Michigan resident and the Director of Prisons for the MDOC. Defendant Washington is being sued in her individual and supervisory capacity.

57.    Defendant, KENNETH MCKEE ("McKee"), was at all times relevant a Michigan resident and the Deputy Director of Prisoners for the MDOC. Defendant McKee is being used in his individual and supervisory capacity.

58.    The defendants being sued in their supervisory capacities at the very least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending subordinates.

59.    When the violations alleged in this complaint occurred, none of the above-named individuals were acting in furtherance of a legitimate governmental function and thus are not entitled to governmental immunity.

## STATEMENT OF FACTS

60.    On November 18, 2016, Mrs. Tina Glover and her infant son, R.G., went to visit her husband and father of her son, Mr. Richard Glover, at JCF.

61.    Before her visit, Mrs. Glover had made arrangements with a sergeant so that she could bring her son's baby blanket and bottle in to the visit.

62.    Upon arrival, Defendant Rivas told Mrs. Glover that she could not bring the baby blanket and bottle inside of the facility. Mrs. Glover explained that she had gotten prior permission and requested to speak to shift command.

63.    Shift command, Defendant Gordon, arrived and told Mrs. Glover that she would not be able to bring the baby blanket and bottle, despite her explaining

that she had received permission from Sergeant Cooper to bring the items in for her visit.

64.    In order to have the visit with her husband, Mrs. Glover placed the baby blanket and bottle inside of her locker. Upon entering the gates, Defendant Rivas conducted a pat down on Mrs. Glover.

65.    When conducting the pat down, Defendant Rivas aggressively groped Mrs. Glover's breasts, and her inner thighs/genital area.

66.    Defendant Rivas's pat down of Mrs. Glover exceeded a reasonable search and was done in response to Mrs. Glover's request to see shift command.

67.    After groping Mrs. Glover, Defendant Rivas required a strip search of baby R.G. Mrs. Glover was required to remove all of R.G.'s clothing in an area open to others so that Rivas could watch Mrs. Glover change her son's diaper.

68.    MDOC Policy does not require infants to be stripped searched in order to enter the facility. Defendant Rivas had no basis to strip search R.G.

69.    Defendant Rivas acted in retaliation when she forced Mrs. Glover to strip her infant son in order to have a visit with her husband.  Mrs. Glover had never been required to strip her son naked on any prior visit or any visit after.

70.    After this incident, Mrs. Glover was visibly shaken and crying when she met her husband for their visit. Mr. and Mrs. Glover immediately asked

officer Defendant Sierminski if they could speak to shift command. Defendant Sierminski would not permit the Glovers to speak to shift command.

71.    Mr. and Mrs. Glover described the incident to Defendant Sierminski in detail and asked again if they could speak to shift command about Defendant Rivas. In response, Defendant Sierminski threatened to terminate their visit if they requested shift command again.

72.    Defendant Sierminski's threat was an act of retaliation against Mr. and Mrs. Glover for asking to talk to shift command about Defendant Rivas's unlawful conduct.

73.    Sometime later during the visit, Defendant Smith, the deputy warden, was doing rounds with Defendant Howard, also a deputy warden. Mr. and Mrs. Glover explained what had happened with Defendant Rivas and Defendant Sierminski. Defendant Smith informed Mrs. Glover that he would look into it and get back to her as soon as possible. Whatever manner in which Defendant Smith looked into the situation, this was the beginning of endless retaliation and harassment against the Glovers.

74.    Mrs. Glover made a complaint to several people including the facility inspector, Defendant Scott Bailey. Defendant Bailey never responded to any of Mrs. Glover's complaints about the improper search or continued retaliation or did anything to curb the improper conduct of his subordinates in the facility.

75.     Mr. Glover filed a grievance about Defendant Sierminski and Defendant Rivas. On 11/24/16, Defendant Gordon called Mr. Glover out from his work assignment to discuss the grievance he wrote about the incident with Defendants and spent over an hour pressuring Mr. Glover to sign off on the grievance and state that Mrs. Glover was lying about the incident with Rivas. To sign off means to agree that this grievance should be denied and is without merit. Mr. Glover refused, and the next day, Defendant Gordon continued to pressure him to retract the grievance by calling his unit officer and requesting him to sign off on the grievance again.

76.     Shortly after, a lieutenant officer sought out and confronted Mr. Glover in the dining hall and told him that she had watched the video of his wife at the security gate and that as far as she was concerned, Rivas did not search Mrs. Glover enough and if she could, she would write Mr. Glover a misconduct ticket for filing his grievance.

77.     This preservation of this video was requested on behalf of Mr. and Mrs. Glover.

78.     In Mr. Glover's grievance, he included that there was a witness to the inappropriate touching of his wife, a visitor who was willing to write an affidavit that supported Mrs. Glover's accusations. The grievance was reviewed and denied by Defendant Gordon. Defendant Gordon was involved in the incident

making his involvement in the resolution of this grievance against MDOC policy. Upon information and belief, when the grievance was denied, there was no attempt by Defendant Gordon to speak with or attempt to contact the witness.

79.    An officer who worked in the control center and processed visits at the gate told Mr. Glover that his and Mrs. Glover's names were "ringing bells" in administration as a result of Mr. and Mrs. Glover's complaint about the incident with Defendant Rivas.

80.    Upon information and belief, Rivas has been reassigned because of the complaint and other officers at the facility were unhappy about the reassignment. More than one officer told Mr. Glover to be careful and warned of retaliation from Defendant Gordon and other supervisors because of his grievance and Mrs. Glover's complaints against Rivas and Sierminski. Upon information and belief, staff throughout the facility were aware of retaliation and a plan to single out and retaliate against the Glovers.

81.    After Gordon denied the grievance, the grievance coordinator would not give Mr. Glover his step two grievance paperwork. Mr. Glover had to send numerous requests for his step 2 paperwork. After filing the second step of his grievance, Mr. Glover was informed that he was being sent up north across the bridge because he had filed a grievance on the wrong person. Mr. Glover detailed the following conversation in his grievance over the retaliatory transfer:

a.  While being processed for transfer, Mr. Glover asked the officer where he was going. In response, the officer said, "Who are you." He then looked at Mr. Glover and said, "I know who you are" and proceeded to look at a piece of paper then stated, "You are fucked is where you are going, you're going way up there, who did you piss off man, you must have filed a grievance on the wrong person." Mr. Glover responded that he only had one grievance pending and did not think he pissed anyone off. The officer responded, "Whoever it is, is trying to shut you up, good luck, stay out of trouble."

82.    On his way out of JCF, Mr. Glover noticed Defendant Rivas sitting at the information desk making noises and trying to get his attention.  Defendant Rivas then smiled, waived, and said "bye" to Mr. Glover and that she would be waiting if he ever returned to that facility. He did return, she was waiting, and as described herein, she continued to retaliate against him until her recent departure from MDOC.

83.    Mr. Glover was the lead baker for JCF Food Services department and had no disciplinary charges against him when he was transferred to Chippewa Correctional, ("URF"), a facility in the UP, far away from his wife and infant son.

17

84.     Upon information and belief, Defendant Smith and Defendant Howard had Mr. Glover transferred. Defendant Smith initiated the transfer and Howard approved the transfer in response to the Glover's complaint against Rivas. Instead of investigating the legitimate complaint, they transferred Mr. Glover to the UP. Defendant Napier was apprised of their conduct and the situation, but did nothing to intervene.

85.     Once at URF, a counselor called Mr. Glover into the office and Mr. Glover asked why he was transferred up north. The counselor looked at the transfer order and stated that the purpose of transfer was to swap prisoner Glover out with a prisoner who had a writ. The counselor further stated that there was actually no prisoner swapped from this prison with Mr. Glover and that this was an excuse to transfer Mr. Glover.

86.     Shortly thereafter, Mr. Glover was called into an inspectors' office concerning an investigation by Defendant Anderson into the statements of retaliatory transfer made by the officer in Mr. Glover's grievance.  After, Mr. Glover was again called into the inspector's office to answer another questionnaire from Defendant Bailey about his grievance for the retaliatory transfer. Defendants Anderson and Bailey were fully apprised of the retaliatory transfer and conduct.

87.     On September 26, 2017, Mr. Glover was transferred back to JCF.

88.    Upon information and belief, the officer in Mr. Glover's retaliatory transfer grievance had been investigated and punished, and some staff did not want Mr. Glover at JCF.

89.    Upon information and belief, the retaliation and situation between Mr. and Mrs. Glover and Defendant Rivas, and other supervisory staff at JCF, was known throughout the facility. Upon learning of Mr. Glover's return, officers told him, "Don't let Rivas find out you're back."

90.    Within the first week of his return to JCF, Mr. Glover's phone privileges were cut off for no legitimate reason whatsoever. Upon information and belief, Mr. Glover's phone privileges were restricted because Mr. Glover was a "legal beagle" with a "target on his back."

91.    A few days later, Defendant Rivas had Mr. Glover handcuffed and sent to segregation while he was attending school. Mr. Glover had not done anything wrong to justify Defendant Rivas's decision to send him to segregation. Defendant Rivas ordered him and other random inmates for a shakedown. After she performed her search of everyone, including Mr. Glover without any incident, she proceeded to call for officer assistance and had Mr. Glover taken to segregation for no reason.

92.    Once Mr. Glover was released from segregation, an officer apologized to Mr. Glover for what was going on and returned Mr. Glover's phone privileges.

Mr. Glover was informed that officers were being instructed to shake down Mr. Glover's cell and belongings only. Officers reported the retaliatory conduct to the warden and other supervisor officers. Further, the union representative did not represent Rivas during the investigation of Rivas's conduct to Mr. and Mrs. Glover and that Rivas was investigated, suspended and reassigned.

93.     Mr. Glover filed a grievance about being placed in segregation out of retaliation and wrote a letter to Defendant Lindsey describing the retaliation and asking him to view the security footage showing he did nothing to deserve being thrown in the hole for several hours, to no resolve.

94.     Shortly after, Mr. Glover went to a callout in healthcare / dental. Classification Director Stacey Purdy and Defendant Gordon then wrote Mr. Glover a false misconduct ticket for being "Out of Place." Mr. Glover was not "out of place" and the ticket was dismissed because the records demonstrated that Mr. Glover had a health care/dental call out during the time and was therefore not "out of place" but merely at his scheduled appointment.

95.     On October 23, 2017, Mr. Glover wrote a letter to hearings investigator, Defendant Salinas, requesting the documents related to his misconduct hearing where he was found not guilty of the "out of place" ticket. According to policy, Mr. Glover was entitled to the report and findings of his dismissed ticket and Salinas would not provide these documents to Mr. Glover. Defendant Salinas

knew Mr. Glover needed the documents to appeal the decisions to show continued retaliation.

96.     Upon information and belief, Defendant Salinas was in a relationship with Defendant Rivas. Mr. Glover filed a grievance against Joel Salinas for his failure to provide Mr. Glover with the hearing investigation documents that he was entitled to and which proved his innocence for Defendants false ticket.

97.     As a result of the issues Mr. Glover was facing at JCF, specifically retaliation and harassment by staff, Mr. Glover was forced to drop all of his Jackson College classes for the semester.

98.     On October 28, 2017, Mr. Glover was called to the officer desk by two officers. An officer informed Mr. Glover that Rivas had called the unit requesting the Mr. Glover return his college textbook. Mr. Glover told the officers that the book was to be returned to Jackson College staff, not Defendant Rivas, and that there was an active investigation between him and Rivas. Mr. Glover told the officers that he would return the book to Jackson College facilitator. The officers threated to write a ticket and Mr. Glover returned the book to the school and gave it to Officer Black on the first floor. Officer Black, aware of the issues between Mr. Glover and Rivas, told Mr. Glover that she would make sure the book was returned.

99.   Mrs. Glover sent an email to the Jackson College Facilitator, concerning the textbook, asking if the professor actually requested Richard's book to be returned. The facilitator responded to the email within an hour and stated that the professor had not called for Richard to return any books. Plaintiff filed a grievance on this abuse of authority, intentional retaliation and harassment by Rivas and wrote another letter to Defendant Lindsey.

100.   On November 15, 2017, while Mr. Glover was on a visit, Defendants Thelen and Moseley performed a retaliatory shakedown and searched his property for over two hours. When Mr. Glover returned from his visit, Defendant Thelen told him "I didn't want to shake your cell down like that but I got a call." After this search, his cell was in disarray and several of Mr. Glover's legal documents disappeared including declarations from Mr. Glover, other prisoners, and his notes. Mr. Glover wrote a grievance against Defendants Thelen and Moseley for their conduct.

101.   Two days later, Defendant Bailey wrote a false misconduct ticket against Mr. Glover stating that he slammed the door and caused the window to shatter. This was false because Mr. Glover did not do this.

102.   Mr. Glover wrote a statement explaining that he had not caused the window to shatter and sent a copy to the Warden. No administrative hearing was

ever held for this misconduct ticket. Upon information and belief, the misconduct ticket was thrown out by Warden Steward.

103.   Mrs. Glover had been sending mail to Mr. Glover. However, none of her mail was being given to Mr. Glover and was held in the mailroom for nearly two weeks at times or given to Mr. Glover in bits and pieces and not in whole as sent by Mrs. Glover.

104.   The Glovers made numerous complaints and grievances to the JCF administration about mailroom staff, Defendant Brian Madery and others withholding his mail. Mrs. Glover continued to make complaints and request information from the director's office about the withholding of her husband's mail.

105.   In response to the complaints, Defendant Madery issued a notice of mail rejection, rejecting Mr. Glover's mail falsely claiming it was "voluminous" and against MDOC policy. This was not part of the policy.

106.   Mr. Glover wrote a letter to Defendant Napier, the Warden's administrative assistant, and Defendant Blair, the facility manager, regarding mailroom staff Defendant B. Madery's retaliation and other mailroom staff's rejection and withholding of his mail against policy. On the same day, he wrote a letter to the mailroom staff regarding their reason for rejecting the mail sent

from Mrs. Glover and wrote a grievance against them for retaliation and abuse of the mail policies.

107. An administrative hearing was held, and the rejection upheld per the orders of Defendant Napier and Defendant Blair. Mr. Glover filed a grievance appealing the mail rejection hearing.

108. Soon after, Mrs. Glover sent a JPAY message and five photos to Mr. Glover and Mr. Glover sent a message to Mrs. Glover. Neither Mrs. Glover nor Mr. Glover received each other's JPAY messages.

109. Mr. Glover sent a letter to the mailroom about the electronic messages/ JPAYs, to no avail. Mrs. Glover contacted two JPAY representatives who both verified that the transactions had been sent and stated that the facility was responsible for blocking the messages. There was no legitimate reason to block their messages. Upon information and belief, the facility manager, Defendant Blair and later Defendant Schubring, are in charge of JPay messages. Defendants Blair and Schubring withheld properly sent JPay photos and messages between Mr. and Mrs. Glover, including unreasonably denying photos for improper reasons, for example, claiming a photo of R.G. at the beach was impermissible "nudity" and a photo of Mrs. Glover fully clothed was "lingerie."

110.   After sending his letter and learning that facility was blocking the messages, Mr. Glover wrote a grievance for retaliation for intentionally blocking Mr. and Mrs. Glover's communication for no lawful basis.

111.   Defendant Napier told Mr. Glover that some of the mail sent from Mrs. Glover had tracking numbers which were tampered with by the mailroom staff. Napier took the envelopes to the post master general who confirmed that the tracking numbers had in fact been removed from the envelopes after they were received by the facility.  Other than informing Mr. Glover, Napier did nothing to intervene or remedy the situation.

112.   After learning this information, Mr. Glover filed a grievance with the inspector's office against the mailroom staff for obstruction of correspondence with intent to impede the Glover's communication and retaliate against them for filing complaints.

113.   During the course of the grievance process for Mr. Glover's grievance regarding the rejection of his mail, Defendant Blair intentionally falsified and/or altered documents, specifically the dates on which the response was returned to Mr. Glover, impacting his ability to timely respond. Mr. Glover filed a grievance on Defendant Blair's actions.

114.   On 2/23/18, Defendant Kennedy wrote Mr. Glover a false misconduct ticket falsely alleging that Mr. Glover called Kennedy a "fucking faggot."

Defendant Kennedy told Mr. Glover that he was instructed to write the misconduct ticket by Defendants Thelen and Moseley. Upon information and belief, this was in response to Mr. Glover's filing grievances. Mr. Glover never used that language towards Kennedy or any other officer or person at JCF.

115.   Mr. Glover sent a letter to Defendant Warden Lindsey explaining Kennedy's falsifying the misconduct, and the staff abuse and retaliation he was experiencing and filed a grievance. Mr. Glover wrote a statement regarding his upcoming hearing on the misconduct ticket issued by Kennedy and attached witness statements and requested video footage be viewed, as it supported his story and disproved Kennedy's claims.  Defendant Lindsey did not respond or intervene in the matter.

116.   Defendant King held the hearing for the misconduct ticket issued by Kennedy. King found Mr. Glover guilty and issued 30 days loss of privileges as punishment. Prior to finding Mr. Glover guilty, Mr. Glover asked King to review the video footage of his unit. King denied this request and advised Mr. Glover that he was finding Mr. Glover guilty based solely on Defendant Kennedy's statement. Mr. Glover tried to explain that everything in the ticket is fabricated and it was even written two days after the alleged incident took place. In response, Defendant King told Mr. Glover to "appeal it." Mr. Glover asked who he should appeal it to. Defendant King stated, "Deputy Smith… good luck," insinuating

that the appeal for the frivolous ticket would be denied regardless of Mr. Glover's side of the story. Mr. Glover did appeal the misconduct, and Defendant Smith, unsurprisingly, denied the appeal. Mr. Glover filed a grievance against Defendant King for retaliation.

117.   Defendant McCumber-Hemry, the grievance coordinator, intentionally mislabeled Mr. Glover's grievance so that it would not be investigated, in violation of policy. Mr. Glover wrote McCumber-Hemry a letter in attempt to resolve the issue. Mr. Glover did not receive a response. Mr. Glover then filed a grievance on McCumber-Hemry. Mr. Glover did not receive a response to his grievance and sent a kite for the Step II appeal form. Several days later Mr. Glover was issued another Step I Grievance Receipt with a new and proper grievance number for his grievance against Defendant King, and a rejection for his grievance on McCumber-Hemry. Both grievances were signed by McCumber-Hemry but did not provide explanation for the wrongful mislabeling, wrongful rejection, or untimeliness of her response and processing of Mr. Glover's grievance.

118.   Mr. Glover wrote a letter to Defendant Lindsey regarding Defendant Smith's denial of his appeal and requesting it be overturned, and alerting him of grievance staff altering and falsifying documents. Defendant Lindsey never

responded. Mr. Glover sent his letter to the Office of Legislative Corrections Ombudsman for resolution as well, but received no response.

119.  In May 2018, after Mrs. Glover filed a complaint about Defendant Brooks' continued harassment at the entrance gate, Defendant Brooks forced Mrs. Glover to expose her breasts without consent or any relevant reason in order to have her visit with Mr. Glover.  Defendant Winter refused to take a statement from Mrs. Glover about Defendant Brook's conduct for strip searching Mrs. Glover without reason. A lieutenant eventually took Mrs. Glover's statement for investigation, but upon information and belief, he was transferred from JCF.

120.  In response to Mrs. Glover's complaint on Defendant Brooks, Defendant Brooks began to retaliate against Mrs. Glover by denying items like a sippy cup for R.G. that other children are permitted to have in the visiting room, delaying visits, denying visits for false reasons, and intentionally processing other visitors before Mrs. Glover and R.G. forcing them to wait an unnecessarily long amount of time in the lobby. Similarly, Defendant Winter acted in conjunction with Defendant Brooks in denying Mrs. Glover and R.G. access to R.G.'s sippy cup during visits. After Mrs. Glover complained to Lansing, over Winter's denial, she printed their email response that stated she was allowed to bring it in and brought it on her next visit in attempt to avoid the blatant harassment and retaliation she faced when visiting her husband.

121.   After Mrs. Glover made complaints to Defendants Howard and Napier, the section of the policy directive which required visitors to be processed within 30 minutes of their arrival was conveniently deleted from the policy.

122.   On June 20, 2018, Mr. Glover had a visit with Mrs. Glover and his son. During the visit, Mrs. Glover purchased a microwavable bowl of macaroni and cheese from the vending machine. This commonly sold meal comes in its own microwavable bowl / packaging. Like soup, it must be heated in a bowl-like container. After her purchase, Defendant William Hokanson arbitrarily ordered Mrs. Glover to empty the uncooked noodles, cheese onto a paper plate *before* she would be able to place it in the microwave to cook. Mrs. Glover explained that this is not how this item is cooked, referencing the directions on the bowl and stated that she has cooked it in the microwavable bowl on several previous visits. She explained there was no other way to cook the macaroni and cheese and if she did what he ordered her son would be eating particles of the paper plate. Defendant Hokanson responded that he did not care. Mrs. Glover pointed to the signs on the vending machine and requested to speak to shift command.

123.   Prior to this day, Mrs. Glover nor any other visitor ever had this issue. No other visitor has ever been required to dump the macaroni and cheese from the bowl.

124.    Shortly after requesting to see shift command, Hokanson ordered Mr. Glover out of the visiting room and stated to Mr. Glover "since you want to engage in protected conduct let's see how a DDO works out for you." Mr. Glover asked why he would receive a ticket because he had not disobeyed any direct orders. Hokanson responded "you'll see smart ass. I can care a fuck less about your protected conduct or the court. I'm already on a two-year probation with four months to go." He then walked away from Mr. Glover toward Defendant Captain Bailey who twice told Hokanson "I got your back."

125.    Mr. Glover asked Defendant Bailey if his visit was being terminated. She said it was being terminated because of the issue with the macaroni and cheese and Hokanson said that Mr. Glover has disobeyed his orders to dump out the food. Mr. Glover told Defendant Bailey that first, this order was given to Mrs. Glover not him, and second, that the policy states Mr. Glover, as a prisoner, is not allowed to dump food onto plates. Defendant Bailey told Mr. Glover to "take it up with the hearings officer, the camera doesn't have audio so its your word against his," insinuating he would be found guilty regardless. Mr. Glover reiterated his request to see a supervisor and told Defendant Bailey that Hokanson was doing this out of retaliation. She responded, "prove it," with a smirk on her face.  She continued to tell Mr. Glover that if he and Mrs. Glover don't do what they say, they would be treated in this manner every time.

126.   When Mrs. Glover requested to speak with someone about why their visit was terminated, Defendant Winter made false allegations accusing Mr. Glover of misconduct and threatened Mrs. Glover with a visitor restriction. Mr. Glover did not commit any misconduct.

127.   Hearing Officer Ale Schneider held a hearing on the ticket Hokanson gave Mr. Glover regarding the macaroni and cheese. After hearing Mr. Glover's side of the story, and learning of this retaliation and harassment by Hokanson, Schneider still found him guilty, and ordered a 21-day loss of privileges, "LOP", as punishment. Not only did Schneider find him guilty on this baseless ticket, he failed to intervene in the unlawful retaliation that he knew Mr. Glover was experiencing. As an officer he had the duty to intervene in constitutional violations. Mr. Glover appealed the determination. Upon information and belief, another inmate who was found guilty of sexual misconduct in the visiting room was given only a 14-day loss of privileges, far less than Mr. Glover for a legitimate and far more serious infraction.

128.   After serving the 21-day loss of privileges, Richard Russell reversed the guilty finding and had the misconduct violation expunged from Mr. Glover's files.  The same day Richard Russell reversed the guilty ticket from Mr. Glover's record, Mr. Glover was given a security classification for the purpose of a transfer.

129.    Defendant Rivas told Mr. Glover that he was packing up his belongings because he was being transferred to ARF. Mr. Glover immediately called his wife to inform her of his impending transfer. Mrs. Glover then called the office of the Director of Prisoners, Heidi Washington. Shortly after, Mr. Glover was advised that the transfer had been canceled.

130.    Defendant Napier claimed that no classification existed to transfer Mr. Glover, however, the log book specifically showed he was to transfer out, and he was instructed to pack his belongings. Only after Mrs. Glover called Heidi Washington's assistant was the transfer stopped.

131.    When Mrs. Glover FOIA'd information about Mr. Glover's canceled transfer, she was provided an email where an MDOC employee asked if anyone had been disciplined because of this transfer. Another employee responded, "not as of yet."

132.    Before the charge was reversed and expunged, Defendant Hokanson came to Mr. Glover's unit to harass and retaliate against Mr. Glover. Upon his arrival in the unit, Hokanson tried to get the unit officer to write a misconduct ticket on Mr. Glover for being out of his cell while he was on LOP. The officer informed Defendant that Mr. Glover had his permission and authorization to be out of his cell at that time. Defendant Hokanson threatened to write up the officer and give Mr. Glover a ticket himself. The officers proceeded to have a big

argument on the base in front of all the prisoners. Mr. Glover filed an administrative notice with the inspector's office and a grievance. Upon information and belief, Defendant Hokanson was then ordered to stay out Mr. Glover's unit.

133.  Soon after, while on a visit, Defendant Hokanson approached Mr. Glover and asked for his "lock," his housing unit information. Out of fear from Defendant Hokanson's past actions, Mr. Glover silently pointed to his ID card where his lock information was located and clearly visible. Defendant Hokanson then stated he was "going to write his ass a DDO." Defendant Hokanson and Knapp then wrote Mr. Glover a ticket. Defendant Knapp wrote a false statement to support the false ticket, despite his presence and knowledge of the retaliatory and wrongful conduct of Defendant Hokanson and a clear opportunity to intervene.

134.  After writing the ticket, Defendants Hokanson and Knapp taunted the Glovers asking if "they would request an investigation into this ticket too;" "I want them gone, they're a pain in the ass;" "Once they're gone, the visits can go back to normal." Knapp then stated to Hokanson, "I got your back, whatever you need me to do brother."

135.  These statements were said loud enough for Plaintiffs and others in the visiting room to hear.

136.   Mr. Glover filed a grievance.

137.   This frivolous ticket by Knapp and Hokanson was also dismissed.

138.   Mrs. Glover had sent mail to Mr. Glover. She sent some MDOC policy statements. Defendant Lindsey told Mrs. Glover she could mail the policies to Mr. Glover. Notwithstanding that the mail was permissible and not against policy, as it was specifically permitted by the Warden, the Glover's mail was rejected by Defendant Madery.

139.   On 8/22/18, while on a visit, Defendant Hokanson refused to sit the Glovers near the toy section in the visiting room. This was done intentionally and out of spite to keep Mr. Glover's son from accessing the toys and where Mrs. Glover had just had foot surgery and could not walk back and forth to the toy area. The Glovers requested to speak with shift command but were refused. They were told they needed to terminate their visit in order to speak with shift command. Because the visit had become too painful for Mrs. Glover, the Glovers were forced to terminate the visit. On his way back to his unit, Mr. Glover explained the situation to a sergeant in the control room. The sergeant said Hokanson can sit them wherever he wanted and sent Mr. Glover back to his unit.

140.   Shortly after, the sergeant had Mr. Glover summoned to the control center and apologized to Mr. Glover about the incident in the visiting room. He stated that they reviewed the camera and determined Hokanson was wrong and

that he would be removed from the visiting room for the rest of the evening and reassigned to the yard.

141. Upon information and belief, officers had reported Hokanson to Defendant Bailey because Hokanson was a "monster" and should not be working for the department. Upon information and belief, Hokanson had a lot of friends who worked at a level one facility and planned to get his justice on Mr. Glover by having a weapon placed in his area of control where the cameras could not see in the cubes. This information was relayed directly to Mr. Glover.

142. On 4/10/19, while on a visit, Defendant Hokanson, now permitted back in the visiting room, once again demanded Mr. Glover remove the packaging from food immediately after purchase. Knowing the policies, Mr. Glover requested to speak to a supervisor. A Lieutenant came to the visiting room, reviewed the rules/memo, and explained to Defendant Hokanson and Moses that Mr. Glover was correct. Upon being told he was wrong, Defendant Hokanson got upset and went to Defendant Howard to complain.

143. On 4/15/19, Mr. Glover approached Defendant Michelle Parsons concerning funds not being processed and placed into his account, so he could make a call to his attorney. Defendant Parsons did nothing in response, even though the funds were being held up because of her not checking her mail box. Mrs. Glover then sent a complaint via email to the Resident Unit Manager who

immediately came to investigate and spoke with Defendant Parsons, as well as to Officer Hammond, who verified the allegation that Defendant Parsons did not regularly check her mail box.

144.   Shortly after, Defendant Parsons had Mr. Glover moved out of the unit and changed his security classification level to level one. Defendant Parsons stated that Defendant Kisor told her she did not have to check her mail box and could drag her feet in performing her job. Defendant Parsons proceeded to tell Mr. Glover that she is prejudiced against prisoners in general, that the prisoners already have too many rights and that the guards can drag their feet as they please. She continued to carry on and explicitly told Mr. Glover that he would never be her equal because of the color of his skin, because he is black.

145.   Defendant Tiffany Kisor knew Mr. Glover had complained about Defendant Parsons and did not like it. In response, Defendant Kisor approved the security change in order for Mr. Glover to be placed in level one, where he had received threats for Hokanson.

146.   Out of fear of further retaliation in level one, based on what Mr. Glover learned would happen to Mr. Glover in level one, he would be set up with weapons by friends of Hokanson, Mr. Glover refused to go to level one. He was then placed in segregation and written a misconduct ticket.

147.   While in segregation, Mr. Glover experienced extreme depression and was unable to eat. He was placed in a cell that did not have access to drinkable water. Mr. Glover was in segregation for eight days, three days with eating.

148.   Upon information and belief, and according to officers at JCF, Parsons moved Mr. Glover because of the complaint filed by Mrs. Glover about Parsons and the funds not getting to Mr. Glover's account. Mr. Glover was advised to stay in segregation in order to not receive more tickets. Given the immense loss of privileges to those in segregation, this was not a viable option.

149.   On 7/19/2019, when Mrs. Glover was at the facility for a visit, she complained to Defendant Hill about the gate officer's discriminatory conduct to her. In response, Defendant Hill harassed and threatened Mr. and Mrs. Glover during their visit and threatened to terminate the visit. Mr. Glover filed a grievance for Hill's harassment.

150.   Mr. Glover was interviewed by Anderson on the grievance against Defendant Hill. Anderson pressured Mr. Glover and attempted to get him to sign off of the grievance. Mr. Glover refused to retract his grievance.

151.   Throughout this time, the mailroom Defendants have continued to reject and deny mail sent by Mrs. Glover to Mr. Glover. Mrs. Glover contacted various people in administration and explained the continuous retaliation and refusal of the mail room to give Mr. Glover his mail. She explained the unequal

treatment and missing mail and that only after Mrs. Glover makes complaints is the mail ever given to Mr. Glover and sometimes it is just rejected under false reasons that are not in policy.

152.   On 7/26/19, Mr. Glover was attempting to exit his top bunk while utilizing the chair provided and approved by MDOC personnel and JCF facility. Unbeknownst to Mr. Glover, the chair was not designed as a step stool for which MDOC permitted it to be used and as a result, Mr. Glover fell off of the chair and sustained a serious injury to his head and back. The head injury was so severe it caused Mr. Glover to suffer from a seizure and to continue to suffer from serious pain, numbness, falls and other issues as a result. Mr. Glover had never experienced a seizure prior to this incident. In addition to the seizures, Mr. Glover suffered a concussion and serious back injury from the fall. Mr. Glover was taken to Henry Ford Hospital.

153.   When Mr. Glover returned from the hospital, he noticed his cell had been searched and was told it had been searched for over two hours. A photograph of Mrs. Glover was removed from his possession and a contraband notice was left by Defendant Kennedy. Defendant Kennedy told Mr. Glover that Defendant Schubring took the photo and placed it in the contraband lock up. Defendant Kennedy was instructed to write the notice. However, the photograph of Mrs. Glover is now missing from the lock up. Pursuant to MDOC policy, contraband

is either to be destroyed or sent home to family, not kept at the facility. Mr. Glover filed a grievance about this situation however, because the photo is now "missing" from the lock up, no hearing can be held by Officer Pull on Mr. Glover's grievance. Upon information and belief, several officers in addition to Kennedy and Schubring have viewed the photo.

154.   When Mr. Glover returned from the hospital, he was not provided with any of the medications, details, or equipment prescribed by Henry Ford for his injuries. He was refused a bottom bunk detail and was required to climb up and down from the top bunk.

155.   Mr. Glover sent a healthcare request for the prescribed medication but did not receive any resolution. Mr. Glover was eventually provided a walker and a wheelchair by housing unit staff when healthcare failed to do so.

156.   Mr. Glover grieved Defendant Lindsey about the chair given to him as a step stool to get up and down from his bunk. Unknown to Mr. Glover, these chairs explicitly state not to use as a step stool or to stand on them, however, no ladders are provided for inmates to get up and down from the top bunk, only the chairs are provided. JCF staff has specifically used the chairs to get up and down the bunks, despite a clear warning on the chairs that they should not be used in this manner. Upon information and belief, Defendant Lindsey, Kisor, King, and Smith knew of and approved the use of these chairs for use to climb up and down

from the top bunk despite the clear risk of serious harm from utilizing the chairs in such a manner. As a result of Defendant's decision, Mr. Glover was severely injured. Defendant King and Kisor denied the grievance at step 1. Defendant Smith denied Mr. Glover's grievance at the next step, claiming it was his fault for standing on the chair provided, but failed to address how else Mr. Glover would have gotten to and from the top bunk.

157.   Upon information and belief, other prisoners at JCF had fallen from the chairs prior to Mr. Glover.

158.   In response to Mr. Glover writing a grievance on Defendant Lindsey for the chair policy, Defendant King, on behalf of Defendant Kisor, wrote a false ticket on Mr. Glover alleging Destruction or Misuse of Property, attempting to charge Mr. Glover with a misconduct and require restitution payments in excess of $13,000 for Mr. Glover's fall from the chair. This ticket was arbitrary and false where Mr. Glover had been provided the chair to use to gain access to and from the top bunk and in no way misused or damaged any MDOC property. This misconduct ticket was issued almost one month after Mr. Glover fell, but only a few days after Defendants King and Kisor denied Mr. Glover's grievance on Defendant Lindsey.

159.   Prior to any hearing on this ticket, Defendant Howard stated that he would have to do the appeal, insinuating he knew the ticket from King would be

upheld. However, this ticket was not upheld. Mr. Glover requested a hearing on the ticket. At the same time, Mrs. Glover called a news reporter who contacted the MDOC spokesperson to discuss the absurd ticket in issued response to an accident which caused injury. The ticket was then dropped.

160.   On 7/28/19, Defendants Sgt. Reynolds, Freymuth and Snyder, took Mr. Glover's walker and wheelchair from him while on a visit. Freymuth called Mr. Glover a cry baby and threatened to write Mr. Glover a ticket for assault and throw him into segregation if he were to fall on Freymuth from lack of balance.

161.   Mrs. Glover had found a captain to return Mr. Glover's walker and permit Mr. Glover to go to healthcare after the visit. After healthcare refused to see Mr. Glover, Defendant Snyder took away his walker again.

162.   Mr. Glover asked Defendant Anderson why he was being treated in this manner and Defendant insinuated that it was still out of retaliation for the Glover's protected conduct.

163.   The next day, Mr. Glover was wheeled to healthcare and saw a Dr. Victoria Hallet. He was then issued the appropriate medical detail for a bottom bunk, a wooden cane, a wheelchair, extra towels, ice and medicine. She refused to permit Mr. Glover the muscle relaxer prescribed from the hospital stating that he did not need it, however, Mr. Glover was still in pain.

164.   The next day, on 7/30/19, Defendant Hokanson then took Mr. Glover's medicine from him for no lawful reason, preventing him from taking his medication. Defendant Anderson was present and also refused to allow Mr. Glover to have the medication.

165.   A few days later, Mr. Glover had a meeting with Jackson College staff, as he had been able to take classes again. When Mr. Glover arrived at the school in his wheelchair with his assigned pusher, Defendant Rivas confronted him and ordered his pusher to stop pushing him and to go back to the unit. Mr. Glover was not able to attend the meeting. Mr. Glover filed a grievance on Rivas.

166.   The next day, Mr. Glover was in extreme pain, suffering from blurred vision and dizziness. His housing unit officer called healthcare and described his situation. Defendant Brown refused to see Mr. Glover stating his condition was not urgent enough.

167.   A few days later, when Mr. Glover went to the school, Defendant Rivas and Defendant Marsh refused to allow him to use the elevator to access his class on the second floor. This was in response to Mr. Glover's grievance where other inmates who did not have injuries or conditions like his were allowed to use the elevator.

168.   Mr. Glover no longer had a wheelchair detail and was using a cane. He was not permitted an elevator detail, despite his complaints and serious condition.

Defendant Landfair instructed Defendant Hallet not to provide Mr. Glover an elevator detail. Defendant Landfair falsely accused Mr. Glover of faking it and being seen walking without his cane, which was not true.

169.   As a result of these incidents, and in response to his grievance, Defendant Rivas had written Mr. Glover two false misconduct tickets about Mr. Glover's need to use the elevator. Defendant DeMyers reviewed the misconducts and Mr. Glover explained the retaliation and treatment from Rivas, his medical condition, that he used a cane and was unable to walk up and down two flights of stairs, each flight with 28 stairs, while carrying his books. He explained how there were so many other inmates who use the elevator who did not have any injury. Defendant ignored Mr. Glover, found him guilty and gave him 30 days LOP. Defendant DeMyers would not permit Mr. Glover to use the elevator for his condition. Defendant Howard upheld these tickets.

170.   Mr. Glover was then sent to segregation. While in segregation, Mr. Glover spoke to a sergeant and advised him of the retaliation. The sergeant told him that since he wanted to follow policy, he had shit coming.

171.   While leaving segregation, Mr. Glover's back gave out and he fell. He was taken to healthcare in a wheelchair. While in healthcare, Defendant Brown aggressively pinched him and made him stand continuously, despite Mr. Glover's

complaints that he still felt light headed. Defendant Brown told Mr. Glover he was faking and did not provide any treatment.

172.   Shortly after, Mr. Glover passed out on third shift during the night and was found unresponsive by his cellmate. Healthcare checked his vitals and merely instructed staff to place him back in his bed. When he woke up, confused and facing the other direction, his cell mate and unit officer told him what happened.

173.   The next day, on 8/14/19, Mr. Glover felt dizzy and began to vomit before passing out. He was sent to Henry Ford Hospital.

174.   At no point did Mr. Glover fake any injury or symptoms, as he was falsely accused of by Defendants Brown and Landfair. Defendants' false accusations deprived Mr. Glover of treatment for his serious medical needs and access to services available to others without any proper reason.

175.   On 8/15/19, Mr. Glover was advised that Defendant Brown had cancelled his doctor's appointment with Dr. Hallet, even though Mr. Glover hadn't see Dr. Hallet after multiple requests, blackouts, and requests by other staff and even a hospitalization. He was being ordered to walk up flights of stairs, had his medication discontinued on day 3 of 30, and was written numerous misconducts do to this injury. He filed grievances and Mrs. Glover filed

complaints as Mr. Glover continued to suffer from pain, headaches, blurred vision and more.

176.   After complaints from Mrs. Glover to MDOC medical personnel in Lansing, Mr. Glover was seen by Defendant Hallet. She summoned him to healthcare on 8/20/19 and told him in order to get treatment she must examine his anus. He told her he was not comfortable and that it was not related to his injuries. She said if Mr. Glover refused she would write in his medical record that he was refusing treatment. Mr. Glover was forced to comply.

177.   Defendant Hallet, with Defendant Herro in the room and an MDOC officer intentionally blocking Mr. Glover's access to the door, then proceeded to violate Mr. Glover by shoving her finger in his anus with the intent to abuse him. The penetration was painful and not done for a legitimate medical reason. Mr. Glover experienced pain and blood from his anus. Her abuse has caused him extreme mental and emotional distress. Defendant Hallet would not provide medical treatment to Mr. Glover. Defendant Herro was in the room and had the means and opportunity to stop Defendant Hallet's conduct. Defendant Herro instead participated by being a witness to Defendant Hallet's assault.

178.   Mr. Glover filed a PREA grievance. Mr. Glover's grievance was denied, citing insufficient evidence. Mr. Glover was given a four-minute

interview by Defendant Scott Bailey. Mr. Glover appealed this denial, and the denial was affirmed.

179.   Mr. Glover was taken to the hospital for an evaluation after Defendant Hallet's conduct. Upon information and belief, the hospital found evidence of sexual assault but the MDOC denied their finding. Upon information and belief, it was the hospital that called Michigan State Police to investigate the claim, not MDOC personnel.

180.   Mr. Glover still uses and has a detail for his cane, as the result of his medical condition. Defendant Hokanson continued to retaliate and has refused to allow Mr. Glover to sit at the handicapped table in the chow hall. Because Mr. Glover cannot fit in the regular seating with his cane, he is unable to eat in the chow hall. Both Mr. and Mrs. Glover have filed numerous complaints and grievances to no avail.

181.   On 9/3/19, while on a visit, Defendant Hill approached Mr. Glover and said, "since you refused to sign off on the grievance, I'm going to show you harassment, I'm going to make your life a living hell while you're in the visiting room."

182.   After Mr. Glover filed a PREA grievance on Defendant Hallet, Mr. Glover only saw Defendant Wright as his medical provider. Defendant Wright denied his requests for medical details to use the elevator and the chow hall and

as otherwise refused treatment and canceled appointments notwithstanding her knowledge of Mr. Glover's serious medical needs.

183.   On 10/15/19, Mr. Glover had a health care appointment. Defendant Brown canceled the appointment for no reason, refusing treatment to Mr. Glover.

184.   Mr. Glover has written health care requests and sent medical kites requesting accommodations for the elevator and the chow hall. Mr. Glover has a "bottom bunk" detail and a "ground floor room – no stairs steps" detail as well as a no-work detail due to his physical limitations. However, Defendants refuse to provide him with the elevator or chow hall details without any legitimate reason notwithstanding explicit knowledge of Mr. Glover's condition.

185.   On 1/21/20, Mr. Glover had another health care appointment scheduled. Defendant Brown canceled this appointment as well, refusing treatment to Mr. Glover again.

186.   On 1/26/2020, Defendant Snyder, took Mr. Glover's wheelchair and took Mr. Glover's original wheelchair detail, dated and valid through 1/27/2020. Defendant refuses to return the original copy. Mr. Glover has not been provided a wheelchair detail since, however, his condition has not changed.

187.   On 1/28/2020, Defendant Davidson called Mr. Glover to healthcare. Still experiencing pain and problems walking, the unit officer had Mr. Glover taken to healthcare in a wheelchair. Once he arrived at healthcare, assuming he

had a healthcare appointment, Defendant Davidson and Defendant Landfair were present. Defendant Davidson stated "they" do not want you to have a wheelchair. Defendants then ordered Mr. Glover to walk back to his housing unit without the wheelchair that had brought him to healthcare. There was absolutely no medical basis for this conduct and was pure retaliation and arbitrary and baseless physical punishment.

188.   Mrs. Glover is continuously harassed and retaliated when she visits Mr. Glover. On 11/10/19, Mrs. Glover visited Mr. Glover. MDOC staff forced Mrs. Glover to wait in the lobby for approximately two hours before they permitted her to have her visit with her husband. This is happened on several occasions. Defendants Hill, Brooks, Hokanson, Delossantos, and McElroy have been harassing Mrs. Glover and retaliating against her by giving her a hard time when she comes to visit Mr. Glover, including making her wait an unnecessarily long time with their small child, threatening to terminate visits in response to requests to see a supervisor and refusing to permit Mrs. Glover to bring common baby items in for R.G. or allow him to use the toys in the visiting room.  This is such a common occurrence that Mrs. Glover can no longer bring R.G. to visit Mr. Glover as often as desired due to the conduct of Defendants and the impact it has on R.G., a toddler being forced to wait two hours in the lobby, often prevented from playing with toys in the visiting room, and who has been forced to sit in a

dirty diaper due to Defendants' continued harassment and refusal to permit a diaper change.

189.   Defendant Hokanson specifically prohibited other officers from changing R.G.'s diaper, forcing him to sit in his soiled diaper for an extended period of time for no reason whatsoever.

190.   Defendant Hill arbitrarily denied Mrs. Glover a visit claiming her clothes were not permissible. Mrs. Glover wears the same outfit each time she visits the facility, depending on the season, yet occasionally officers like Defendant Hill will arbitrarily prevent access.

191.   Defendant Delosantos has forced Mrs. Glover to wait and held up visits for extended periods of time. Further, Defendant Delosantos refused to let R.G. use toys in the visitor room, despite other children being permitted to access the toys, and forced the Glovers to have their visit next to the officer desk for no reason and not requiring anyone else to do the same.

192.   Defendant McElroy, who worked the gate with Defendant Brooks, subjected Mrs. Glover to unreasonable and unfair searches where she required certain things of Mrs. Glover but not of other visitors in order to visit their loved ones. McElroy forced Mrs. Glover to wait two hours and another officer specifically told Mr. and Mrs. Glover that McElroy was holding up their visits without proper reason.

193.   While Mr. Glover filed numerous grievances, Mrs. Glover filed several complaints about Defendants conduct. The Glovers have filed dozens of complaints abd grievances and sought help from each of the Warden Defendants, Brewer, Lindsey and Nagy, as well as Inspector Scott Bailey of JCF, and Defendants Washington and McKee, to no avail. The retaliation has not stopped.

194.   Mrs. Glover complained to Defendants Washington and McKee about the other Defendants' constant retaliation and the intentional failure to follow policies. For example, among Mrs. Glover's complaints she explained that many Defendants are related and refuse to enforce policy against eachother. Mrs. Glover explained issues with Defendant Scott Bailey and his sister-in-law Defendant Sheryl Bailey as well as Defendant Kim Napier and issues with her husband an officer who works the front desk. Mrs. Glover has reached out to Lansing countless times to contact Defendants Washington and McKee about issues with retaliation at JCF. Defendant Washington and McKee have direct knowledge of the retaliatory conduct experienced by the Glovers. Defendants have had the power to intervene and stop the unconstitutional retaliation unleashed on the Glovers but have chosen not to intervene.

195.   Several corrections officers told Mr. Glover that they knew what was going on between the Glovers, Rivas, and the administrators of the facility. Officers told Mr. Glover that other officers and supervisory staff were retaliating

against him and his wife for grievances and complaints, but not to backdown. The Glover's were "ringing bells" up the administration by attempting to vindicate their rights. At least one officer was punished for telling Mr. Glover he was being retaliated against. Ever since Mrs. Glover reported Defendant Rivas' groping and unreasonable actions, and the continued harassment by JCF staff, Mr. and Mrs. Glover and R.G. had been victims of a coordinated plan of retaliation for their constitutionally protected conduct.

196.  Since the filing of this lawsuit, Defendants have continued to retaliate against Mr. and Mrs. Glover.

197.  Mr. and Mrs. Glover have often reviewed legal documents together during visitation hours. This is permitted pursuant to the Visiting Standards promulgated by Kenneth McKee, deputy director of Correctional Facilities Administration.[1]

198.  On several occasions Defendant Root have denied the Glovers from bringing legal documents to review with each other on visits. On the first occasion, Defendant Root denied Mrs. Glover a visit for 1.5 hours until he let her in with the paperwork. On the second occasion, 1/10/2020, Defendant Root took the legal documents Mr. Glover had brought on the visit. Defendants let Mrs.

---

[1] See Section L, ¶ 9, pg. 8,
https://www.michigan.gov/documents/corrections/Visiting_Standards_-_Effective_October_1_2019_666429_7.pdf

Glover visit without the paperwork while he called the Warden who specifically said Mr. and Mrs. Glover were allowed to review legal papers together, per policy. Approximately one week later, Mr. Glover again brought legal documents and Defendant Root denied access. Defendants took the legal documents to Defendant Rurka out of Mr. Glover's presence, who then refused to let Mr. and Mrs. Glover review the documents. Per policy, legal documents are to be reviewed in front of the prisoners.

199.   Mr. Glover grieved these actions on 1/23/2020. On 1/24/2020, Defendants Nagy and Rurka changed the policy in response to Mr. and Mrs. Glover's protected conduct, claiming family members could no longer bring in legal documents for review with prisoners.

200.   On prior occasions Defendants had permitted Mr. Glover to give Mrs. Glover legal documents with a gate manifest.

201.   Defendant McElroy on several occasions held up visits and let other visitors in before Mrs. Glover despite her first arrival and Mr. Glover already being brought in and ready for the visit.

202.   On 1/27/2020, Mr. and Mrs. Glover formally demanded that Defendants comply with the ADA and permit him to use the elevator and sit at the handicap seating in the chow hall. The day after Mr. Glover's request, Defendant Parsons investigated Mr. Glover's phone history going back

approximately one year in order to find alleged instances of misconduct so that she could take away his phone privileges to Mrs. Glover for approximately the next 6 months. Defendant Parsons wrote three "Notice of Investigations" or "NOIs" on Mr. Glover for alleged phone misuse. Two of the three instances involved an allegation that Mr. Glover impermissibly permitted another inmate to use his phone account in spring 2019. Only Mr. Glover was issued the NOIs for these alleged acts. Only Mr. Glover is currently without phone privileges due to these alleged acts.

203.   After the issuance of the NOIs, policy indicates that Mr. Glover must have a review within 24 hours. The NOIs were issued on 1/28/2020, but Mr. Glover was not given the notices nor reviewed on them until 1/30/2020, yet phone privileges were restricted on 1/28/2020. Mr. Glover had a hearing with Defendant Washington about the NOIs. Mr. Glover explained the entire situation to Defendant Washington, including the history of retaliation and his request for relief under the ADA. Mr. Glover prepared a written statement for Defendant Washington to defend against the accusations alleged. Defendant Washington signed and dated the written statement to notate his acceptance. Defendant Washington did not make a final disposition but needed to continue his investigation. A few days later, Washington met Mr. Glover in his housing unit, told Mr. Glover that he was finding him guilty, and returned Mr. Glover's written

statement, stating that he would not make it a part of the record, notwithstanding that policy specifically permitted Mr. Glover to make a statement on his own behalf and that Washington previously accepted and signed the statement. The statement Washington returned to Plaintiff had been visibly altered through photocopy to cover up Washington's signature.

204.   Mr. Glover wrote a grievance about Defendant Washington's conduct. Defendant McCumber-Hemry has yet to respond to the grievance or provide him with his next step paperwork.

205.   On 2/11/2020, Mrs. Glover attempted to bring legal documents to a visit with Mr. Glover.  Defendant Brooks held the visit up for two hours by denying Mrs. Glover access to the visit with the legal documents. Defendant Brooks pointed at a piece of paper and claimed the policy had been changed and Mrs. Glover was no longer allowed to bring legal documents in to review with Mr. Glover. Mrs. Glover asked to see the policy. Brooks snatched the policy down and held it against her chest refusing to allow Mrs. Glover to review the alleged policy change. This alleged policy change was not posted or available for review to the public.

206.   After being forced back to the lobby, Mrs. Glover stepped out to her car to call her attorney and explain the situation. When she returned to the lobby she saw Defendant Nagy and stopped him to inquire about the alleged rule change,

as the Visiting Standards posted in the lobby had not changed. The Visiting Standards are written by Deputy Director McKee in Lansing and state two things very specifically:[2]

a. First it states, in the first paragraph of the first page, "Deviation from these standards is not permitted without authorization of the Correctional Facilities Administration (CFA) Deputy Director." Upon information and belief, McKee did not approve any of the alleged changes by Nagy or any other Defendant working on his behalf.

b. Second it states, on page 8, "Immediate family members, as defined in PD 05.03.140 *Prisoner Visiting*, may bring legal documents in on a visit for review only with the prisoner." Naturally, PD 05.03.140 specifically includes wives as "immediate family members."

207. Defendant Nagy could not explain why the facilities policy were changed, nor why the policies, as changed, directly contradicted the Visiting Standards, nor why they were changed without approval from the deputy director, as required. After two hours, Mrs. Glover was permitted to bring the legal documents in to review with Mr. Glover.

---

[2] See, p. 1; p. 8 Section L, ¶ 9,
https://www.michigan.gov/documents/corrections/Visiting_Standards_-_Effective_October_1_2019_666429_7.pdf

208.   Recently, when Mr. and Mrs. Glover's attorney went to visit Mr. Glover to discuss the case, Defendant Anderson and Napier would not permit Mr. Glover to give legal documentation to his attorney during their attorney-client visit. While this was previously permitted by JCF Operating Procedure, 05.03.140, section (I)(B) Business Visits, "Prisoners may transfer legal documents to their attorney, in the visiting room, and the attorney may exit with those documents," this policy was changed in response to Mr. and Mrs. Glover's lawsuit in order to frustrate their ability to extract extremely important legal documents from JCF that are necessary to sustain their claims.

209.   On 2/21/2020, Mr. Glover was scheduled a call out with Defendant Wright in healthcare. After Mr. Glover arrived at healthcare, his appointment was canceled. Officer Hartenagle, the officer working in the area, noticed how much weight Mr. Glover has lost, around 50 pounds. She inquired how he was doing and stated she was concerned about him. Mr. Glover explained that they would not permit him to sit at the handicap table, so he could not eat in the chow hall. She did not understand why Mr. Glover was being denied a detail to sit at the handicap table at the chow hall, given his medical needs, obvious weight loss and decline in his health.

**COUNT I**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983**
**Fourth Amendment – Unreasonable Search**

**(Mrs. Glover and R.G. v. Defendant Rivas & Brooks)**

210.  Plaintiff incorporates herein all prior allegations.

211.  The Fourth Amendment prohibits unreasonable searches of citizens.

212.  At all times relevant herein, Defendant Rivas was acting under the color of law and was required to obey the laws of the United States.

213.  While conducting the pat down, Defendant Rivas aggressively groped Mrs. Glover's breasts, and her inner thighs/genital area.

214.  A reasonable search does not include conduct that equate to sexual assault, i.e. groping of breasts and genital areas.

215.  Defendant Rivas's pat down of Mrs. Glover exceeded a reasonable search and was done in response to Mrs. Glover's request to see shift command.

216.  After groping Mrs. Glover, Defendant Rivas required Mrs. Glover to hold newborn R.G. face down unsecured across her arms with minimal support for Rivas's "search." Mrs. Glover was terrified that R.G. would fall or become injured to do lack of support.

217.  Defendant Rivas next required a strip search of baby R.G. Mrs. Glover was required to remove all of R.G's clothing in an open space so that Rivas could watch Mrs. Glover change her son's diaper.

218.  Strip searching R.G. is against policy and exceeded a reasonable search and was done in response to his mother's request to see shift command.

219.   Mrs. Glover filed a complaint about Defendant Rivas's conduct.

220.   Upon information and belief, Defendant Rivas was reassigned to a different position as a result of Plaintiffs' complaint.

221.   Defendant Brooks intentionally and unreasonably forced Mrs. Glover to endure a strip search in order to visit Mr. Glover. There was absolutely no basis for a strip search in order to determine that Mrs. Glover was not a safety threat to the facility.

222.   Mrs. Glover complained about Defendant Brooks unwanted and unreasonable conduct. Upon information and belief, Defendant Brooks was disciplined for her conduct.

223.   Defendant Rivas intentionally groped Mrs. Glover during her pat down and far exceeded a reasonable search when Defendant intentionally subjected R.G. to a strip search without any justification. This was done to Plaintiffs without consent, probable cause, legal justification, just cause, or any other legally valid reason.

224.   Defendant Brooks intentionally strip-searched Mrs. Glover without a lawful basis. This was done to Plaintiff without consent, probable cause, legal justification, just cause, or any other legally valid reason.

225.   Defendants actions constituted a violation of Mrs. Glover and R.G.'s right to be free from unreasonable searches in violation of 42 U.S.C. § 1983 and

the right under the Fourth Amendment to the United States constitution to be free from unreasonable searches.

226.   As a proximate result of the illegal and unconstitutional acts of the Defendants, Mrs. Glover and R.G. were harmed and suffered damages for her mental and emotional injury and pain, mental anguish, humiliation, and embarrassment.

## COUNT II
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### First Amendment – Retaliation for Protected Conduct

**(Mrs. Glover & R.G. v. Defendant Rivas, Brooks, Sierminski, Delossantos, McElroy, Hill, Hokanson, Napier, Lindsey, Winters, Schubring, Root, Nagy)**

227.   Plaintiff incorporates herein all the prior allegations.

228.   The First Amendment prohibits retaliation for protected speech or conduct.

229.   At all times relevant herein, Defendant Rivas was acting under the color of law and was required to obey the laws of the United States.

230.   Mrs. Glover engaged in constitutionally protected conduct when she asked to speak with a shift command officer when Defendant Rivas refused to allow Mrs. Glover to bring R.G.'s baby blanket and bottle into the visit, despite her previous approval.

231.   In retaliation for Mrs. Glover's protected conduct, Defendant Rivas intentionally, knowingly, maliciously, recklessly, unreasonably, and/or gross negligently groped Mrs. Glover and performed and unreasonable strip search of her infant son, R.G.

232.   Mrs. Glover engaged in constitutionally protected conduct when she made complaints against Defendant Brooks after issues with Defendant Brooks at the gate.

233.   In retaliation for Mrs. Glover's protected conduct, Defendant Brooks intentionally forced Mrs. Glover to strip search without reason in order to have a visit with her husband.

234.   Such retaliation would serve as a determent to a person of ordinary firmness from engaging in such protected conduct.

235.   The retaliation was motivated at least in part by the protected speech.

236.   There was a causal connection between Plaintiff's constitutionally protected conduct and the adverse retaliatory actions taken by Defendant against Plaintiffs.

237.   Defendants intentionally groped Mrs. Glover during her pat down and far exceeded a reasonable search when Defendant intentionally subjected R.G. to a strip search without any justification. This was done to Plaintiffs without

consent, probable cause, legal justification, just cause, or any other legally valid reason.

238.   Defendant Brooks intentionally strip-searched Mrs. Glover without a lawful basis. This was done to Plaintiff without consent, probable cause, legal justification, just cause, or any other legally valid reason.

239.   After the first incident with Defendant Rivas and Gordon, Mrs. Glover engaged in constitutionally protected conduct when she continued to request to see supervisors when she experienced harassment and retaliation at the facility, when she complained about Defendants mistreatment of Mr. Glover, and when she filed numerous complaints with JCF and MDOC administration regarding the conduct of Defendants as described herein.

240.   In retaliation for Mrs. Glover's protected conduct, Defendants intentionally, knowingly, maliciously, recklessly, retaliated against Mrs. Glover and R.G. including but not limited to:

   a. Transferring Mr. Glover to the Upper Peninsula to prevent visits; Harassing Mrs. Glover on visits; Threatening to terminate visits and Mrs. Glover's visitor privileges; Intentionally misapplying of MDOC policies in unequal and arbitrary manner; Forcing Mrs. Glover to strip search her son and hold him out in the open for no reasonable basis; Forcing Mrs. Glover to expose her breasts; Making Mrs. Glover and

R.G. wait in the lobby for two hours before staff would process her visit; Preventing Mrs. Glover and R.G. from bringing in baby items like a bottle and blanket, despite permitting others to bring in the same items; Threatening to cancel visits in response to requests to see a supervisor or requests that policies be followed by JCF staff; Intentionally sitting the Glovers away from the toys in the visiting room when other families with small children are permitted to sit by the toys; Forcing R.G. to sit in a dirty diaper for one and a half hours because Rickman refused to permit a diaper change; Tampering with and wrongfully rejecting mail Mrs. Glover sends to Mr. Glover; Intentionally treating Mrs. Glover and R.G. differently than other similarly situated visitors without any rational basis for the difference; Failing to intervene in the retaliation against Mrs. Glover and R.G; preventing Mr. Glover from calling Mrs. Glover to discuss litigation or any other matter.

241.   Such retaliation would serve as a determent to a person of ordinary firmness from engaging in such protected conduct.

242.   The retaliation was motivated at least in part by the protected speech.

243.   There was a causal connection between Plaintiff's constitutionally protected conduct and the adverse retaliatory actions taken by Defendant against Plaintiffs.

244.   As a proximate result of the illegal and unconstitutional acts of the Defendants, Mrs. Glover and R.G. were harmed and suffered damages for her mental and emotional injury and pain, mental anguish, humiliation, and embarrassment.

## COUNT III
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### First Amendment – Retaliation for Protected Conduct

**(Mr. Glover v. Defendant Rivas, Smith, Nagy, Howard, Gordon, Napier, Blair, Salinas, McCumber-Hemry, Bailey, Anderson, Hokanson, Kennedy, Knapp, Moseley, Sierminski, Thelen, Madery, Hill, King, DeMyers, Reynolds, Marsh, Snyder, Freymuth, Kisor, Parsons, Washington, Brown, Landfair, Davidson, Hallet, Root, Rurka)**

245.   Plaintiffs incorporates herein all the prior allegations.

246.   The First Amendment prohibits retaliation for protected speech or conduct.

247.   At all times relevant herein, Defendants were acting under the color of law and were required to obey the laws of the United States.

248.   Mr. Glover engaged in constitutionally protected conduct when he wrote grievances on Defendants for the conduct described herein.

249.   Mrs. Glover engaged in constitutionally protected conduct when she requested to see supervisors and filed complaints with JCF and MDOC administration regarding the conduct of Defendants as described herein.

250.   Upon information and belief, Defendants were aware of Mr. Glover's protected conduct. Many Defendants and officers explicitly told Mr. Glover that he was being treated this way because of his and his wife's protected conduct. Further Defendants were aware that this protected conduct was "ringing bells" with administration and that Mr. Glover had a target on his back.

251.  In retaliation for the Glover's protected conduct, Defendants intentionally, knowingly, maliciously, recklessly, engaged in a coordinated plan of retaliation against Mr. Glover including but not limited to:

   a.   Threatening to terminate visits; Terminating visits; Transferring Mr. Glover to the Upper Peninsula; Failing to Intervene in constitutional violations and retaliations of other corrections officers and supervisory staff; Harassing Mr. Glover's wife, forcing her to expose her breasts in order to visit Mr. Glover; Arbitrarily denying Mr. Glover's wife from bringing baby items in the visiting room, despite permitting other babies and mothers to have these items; Putting Mr. Glover in segregation, in "the hole" for no reason; Threatening to write misconduct tickets for no basis; Writing false misconduct tickets;

Continuously shaking down his cell and possessions; Stealing his
property including declarations and other legal papers; Arbitrary refusal
to follow MDOC written policies; Intentional harassment; Failure to
protect from continued harassment and retaliation; Denying access to
grievance forms, altering / falsifying information, rejecting grievances
against policy; Rejecting and mail and JPay messages against policy;
Removing tracking numbers from mail; Threats of continued
harassment for protected conduct; Reclassifying security level to
transfer Mr. Glover to dangerous units;   Confiscating medical
equipment and medications; Sexual assault; Refusal to treat serious
medical needs; Denying phone privileges; Denying phone privileges to
Plaintiff's Attorney; Changing policies without basis to frustrate
protected conduct.

252.   Such retaliation would serve as a determent to a person of ordinary
firmness from engaging in such protected conduct.

253.   The retaliation was motivated at least in part by the protected speech.

254.   There was a causal connection between Plaintiff's constitutionally
protected conduct and the adverse retaliatory actions taken by Defendant against
Plaintiff.

255.   As a proximate result of the illegal and unconstitutional acts of the Defendants, Mr. Glover was harmed and suffered damages for his mental and emotional injury and pain, mental anguish, humiliation, and embarrassment.

**COUNT IV**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983**
**Eighth Amendment – Deliberate Indifference**

**(Mr. Glover v. Lindsey, Hallet, Wright, Reynolds, Freymuth, Snyder, Brown, Rivas, DeMyers, Marsh, Davidson, Landfair)**

256.   Plaintiff incorporates herein all prior allegations.

257.   At all times relevant herein, Plaintiff had a clearly established right to be free from deliberate indifference to his serious medical needs under the Eighth Amendment to the United States Constitution.

258.   At all times relevant, Defendants were acting under the color of law and were required to obey the laws of the United States.

259.   Defendant Lindsey knew the facility did not provide ladders for prisoners to use to access the top bunks. Defendant Lindsey knew the facility provided small plastic chairs that were not meant to be stood on or used as a ladder due to fall risks. Defendant Lindsey as Warden promulgated the policy which permitted the chairs to be used, despite the clear risks of which he was aware. As a result of Defendant Linsey's conduct, Plaintiff fell while using the chair, had a seizure, and sustained serious injury to his back, including multiple bulging discs as discovered by CT scan.

260.   At all times relevant thereafter, Defendants knew Plaintiff had a serious medical need where he was severely injured, required a walker and wheelchair, and had been experiencing seizures and blackouts. Mr. Glover has fallen several times and continues to experience pain and physical limitations due to his bulging discs.

261.   Defendants Reynolds, Freymuth and Snyder confiscated his wheelchair and walker for no medical reason, forcing him to walk in extreme pain.

262.   Defendants Rivas and Marsh prevented Mr. Glover from using the elevator when he had a detail for a wheelchair and a cane and ordered him to walk painfully up and down near 60 stairs.

263.   Defendant Hallet and Defendant Wright were / are Plaintiff's treating doctors who refused to provide medications, medical equipment or medical details proscribed by Henry Ford Hospital after Mr. Glover was first injured or as needed to treat his continued serious medical needs.

264.    Defendant Hokanson knew of Mr. Glover's injury and confiscated Mr. Glover's medication and would not permit him to take the medication.

265.   Defendant Brown aggressively pinched Mr. Glover and forced him to stand after he passed out and was complaining of being lightheaded. She told him he was faking it and refused to treat his blackout or lightheadedness.

266.    Defendants DeMyers failed to intervene and acquiesced as a supervisor when Defendant Rivas and Marsh refused to allow Mr. Glover to use the elevator despite their knowledge that Mr. Glover had a serious medical need and was in pain.

267.    Defendants actions and inactions constituted deliberate indifference to a serious medical need in violation of 42 U.S.C. § 1983 and his rights under the Eighth Amendment to the United States constitution to be free from cruel and unusual punishment.

268.    As a proximate result of the illegal and unconstitutional acts of the Defendants, Mr. Glover was harmed and suffered damages for his mental and emotional injury and pain, mental anguish, humiliation, and embarrassment.

## COUNT V
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### Eighth Amendment – Cruel and Unusual Punishment

### (Mr. Glover v.  Defendant Hallett)

269.    Plaintiff incorporates herein all prior allegations.

270.     At all times relevant herein, Plaintiff had a clearly established right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

271.    At all times relevant herein, Defendant was acting under the color of law and was required to obey the laws of the United States.

68

272.   Defendant Hallet penetrated Mr. Glover without consent and without a medical basis. Her actions caused Mr. Glover to bleed and experience pain in his anus and well as extreme mental distress from the violation.

273.   Defendant Hallett sexually assaulted Plaintiff.

274.   Prison inmates are constitutional protected from sexual assault as part of their sentence.

275.   Upon information and belief, the hospital sustained Mr. Glover's complaint of sexual assault and called Michigan State Police. However, a nurse told Mr. Glover that the MDOC was sweeping it under the rug.

276.   Defendant Hallett's actions constituted a violation of Plaintiff's right to be free from cruel and unusual punishment in violation of 42 U.S.C. § 1983 and his rights under the Eighth Amendment to the United States constitution to be free from cruel and unusual punishment.

277.   As a proximate result of the illegal and unconstitutional acts of the Defendant, Mr. Glover was harmed and suffered damages for his physical, mental and emotional injury and pain, mental anguish, humiliation, and embarrassment.

### COUNT VI
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### Fourteenth Amendment – Equal Protection

**(Plaintiffs v. Defendants Rivas, Brooks, Delossantos, McElroy, Hill, Hokanson, Napier, Lindsey, Gordon, Bailey, Anderson, Kennedy, Knapp, Moseley, Thelen, Reynolds, Marsh, Snyder, Freymuth, Parsons, Davidson, Landfair, Washington)**

278.   Plaintiffs incorporates herein all prior allegations.

279.   At all times relevant herein, Plaintiffs had a clearly established right to be free from the state and state actor's intentionally different treatment from others who are similarly situated without a rational basis pursuant to the Equal Protection Clause of the Fourteenth Amendment.

280.   At all times relevant herein, Defendants were acting under the color of law and were required to obey the laws of the United States.

281.   Defendant intentionally treated Plaintiffs different than other similarly situated visitors by, but not limited to, the following:

a. Preventing Mrs. Glover and R.G. from bringing in baby items like a baby bottle, milk, and blanket while letting other families bring in these items on visits; Preventing Mrs. Glover from visiting due to her "clothes" even though her clothes were no different than other visitors and did not violate any MDOC policies and she had worn the same outfit on several occasions; Forcing Mrs. Glover to undergo searches that are not performed on other visitors; Intentionally sitting the Glovers away from the toys in the visiting room when other families with small children are permitted to sit by the toys; Harassing Mrs. Glover on visits and not harassing other visitors; Threatening to terminate visits and Mrs. Glover's visitor privileges but not to other

visitors;  Intentionally misapplying of MDOC policies in unequal and arbitrary manner; Failing to intervene in the arbitrary and irrational treatment of Mrs. Glover and R.G.; Transferring Mr. Glover and putting Mr. Glover in segregation without any rational basis or purpose; Only punishing Mr. Glover for alleged rule violations committed by multiple prisoners at the same time; Permitting other prisoners with canes and back issues to use the elevator and to have a detail for handicap seating, but prohibiting Mr. Glover from accessing these services without reason, among others; taking phone privileges from Mr. Glover and not from others who allegedly commit same violations.

282.   Defendants had no rational basis to treat Mrs. Glover and R.G. differently than other visitors nor was there a rational basis to treat Mr. Glover differently from the other prisoners.

283.   As a proximate result of the illegal and unconstitutional acts of the Defendants, Plaintiffs were harmed and suffered damages for her mental and emotional injury and pain, mental anguish, humiliation, and embarrassment.

### COUNT VII
### VIOLATION OF CIVIL RIGHTS UNDER
### 42 U.S.C. § 12101 & 29 U.S.C. § 791
### Discrimination in Violation of Americans with Disabilities Act and Rehabilitation Act

### (Mr. Glover v. Defendant Nagy, DeMyers, Hallet, Wright, Hokanson, Landfair, Rivas and Marsh)

284. Plaintiff incorporates herein all prior allegations.

285. The ADA and RA prevent discrimination based on disability.

286. As a result of Plaintiff's fall and subsequent seizures and injury, Plaintiff is now disabled.

287. MDOC, by and through its officers named herein, have discriminated against Mr. Glover on the basis of his disability by, including but not limited to:

    a. Refusing to allow Mr. Glover to use the elevator in order to attend his classes on the second floor of the school;

    b. Refusing to allow Mr. Glover to sit at the handicapped table in the chow hall.

288. As a proximate result of the illegal and unconstitutional acts of the Defendants, Mr. Glover was harmed and suffered damages for his mental and emotional injury and pain, mental anguish, humiliation, and embarrassment.

## COUNT VIII
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### Conspiracy to Deprive of Rights

**(Plaintiffs v. Defendants Smith, Nagy, Howard, Gordon, Napier, Blair, Bailey, Anderson, Hokanson, Kennedy, Knapp, Moseley, Rivas, Thelen, Hill, King, Reynolds, Marsh, Snyder, Freymuth, Kisor, Parsons, Washington, Brown, Davidson, Hallet, Root, Rurka, Landfair, Winters, Schubring)**

289. Plaintiffs incorporates herein all prior allegations.

290.   At all times relevant, Plaintiffs had a clearly established right to be free from conspiracy to violate their constitutional right to be free from retaliation for engaging in protected conduct.

291.   At all times relevant herein, Defendants were acting under the color of law and were required to obey the laws of the United States.

292.   Defendants agreed to retaliate against Plaintiffs for their engagement in protected conduct as described herein.

293.   Defendant Officers actions and inactions constitute an impermissible conspiracy to deprive an individual of their rights to be free from bodily harm in violation of 42 U.S.C § 1983 and the Fourteenth Amendment to the United States Constitution.

294.   As a proximate result of the illegal and unconstitutional acts of the Defendants, Plaintiffs were harmed and suffered damages for their physical, mental, emotional injury and pain, mental anguish, humiliation, and embarrassment.

## COUNT IX
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### Failure to Intervene

**(Plaintiffs v. Defendants Scott Bailey, Lindsey, Nagy, Brewer, Napier, Davidson, Marsh, Washington, Rurka, Howard, Gordon, Sheryl Bailey, Anderson, King, Blair, Schubring, DeMyers, Knapp, Kisor)**

295.   Plaintiffs incorporates herein all prior allegations.

296.   At all times relevant herein, Defendants were acting under the color of law and were required to obey the laws of the United States.

297.   Defendants had a duty to intervene in the violation of civil rights in the Michigan Department of Corrections when they have the means and opportunity to intervene.

298.   Defendants had a duty to intervene in the unlawful conduct as described herein.

299.   Defendants had the time and opportunity to intervene to end the unconstitutional conduct described herein but chose not to intervene.

300.   Defendant Officers actions and inactions in their failure to intervene violates 42 U.S.C § 1983, and the Eighth and the Fourteenth Amendments to the United States Constitution.

301.   As a proximate result of the illegal and unconstitutional acts of the Defendants, Plaintiffs were harmed and suffered damages for their physical, mental, emotional injury and pain, mental anguish, humiliation, and embarrassment.

## COUNT X
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### Conspiracy to Deprive of Rights

### (Mr. Glover v. Defendants Hallet & Herro)

302.   Plaintiffs incorporates herein all prior allegations.

303.   At all times relevant, Plaintiff had a clearly established right to be free from conspiracy to violate his constitutional right to be free from cruel and unusual punishment.

304.   At all times relevant herein, Defendants were acting under the color of law and were required to obey the laws of the United States.

305.   Defendants agreed to retaliate against Plaintiffs for their engagement in protected conduct when they forced sexual assault on Mr. Glover. Defendant Hallet brought Defendant Herro in the room to watch as she committed the assault. Defendant Hallet and Herro had a corrections officer block access to the door during the act.

306.   Defendant Officers actions and inactions constitute an impermissible conspiracy to deprive an individual of their rights to be free from bodily harm in violation of 42 U.S.C § 1983 and the Fourteenth Amendment to the United States Constitution.

307.   As a proximate result of the illegal and unconstitutional acts of the Defendants, Plaintiffs were harmed and suffered damages for their physical, mental, emotional injury and pain, mental anguish, humiliation, and embarrassment.

**COUNT XI**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983**
**Failure to Intervene / Supervisory Individual Liability**

## (Mrs. Glover and R.G. v. Defendants Washington & McKee)

308.   Plaintiffs incorporates herein all prior allegations.

309.   At all times relevant herein, Defendants were acting under the color of law and were required to obey the laws of the United States.

310.   Defendants had a duty to intervene in the violation of civil rights in the Michigan Department of Corrections when they have the means and opportunity to intervene.

311.   Defendants had a duty to intervene in the unlawful conduct as described herein.

312.   Defendants are supervisors for all of MDOC.

313.   As a result of Mrs. Glover's numerous complaints to Defendants Washington and McKee, they are fully apprised of the retaliation she experiences at the hands of the Defendants at JCF. Defendants Washington and McKee have the power to intervene and stop the unconstitutional conduct at JCF. Defendants have not intervened to end the non-stop retaliation she experiences when trying to visit her husband at the hands of other Defendants.

314.   Defendants had the time and opportunity to intervene to end the unconstitutional conduct described herein but chose not to intervene.

315.   Defendants actions and inactions in their failure to intervene violates 42 U.S.C § 1983, and the Eighth and the Fourteenth Amendments to the United States Constitution.

316.   Defendants, as supervisors for all MDOC employees, implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of Defendants.

317.   As a result of Defendants' implicit authorization and approval, Mrs. Glover and R.G. continue to experience a tremendous amount of retaliation as described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Richard Glover, Tina Glover, and R.G., demand judgment and prays for the following relief, jointly and severally, against all Defendants:

a. Full and fair compensatory damages in an amount to be determined by a jury;

b. Punitive damages in an amount to be determined by a jury;

c. Reasonable attorney's fees and costs of this action; and

d. Any such other relief as appears just and proper.

## JURY DEMAND

Plaintiffs hereby demands a trial by jury of all triable issues, per Fed. R. Civ. P. 38(b).

Respectfully submitted,

EXCOLO LAW, PLLC

Dated: February 24, 2020          By:     */s/ Solomon M. Radner*
                                          Solomon M. Radner (P73653)
                                          Madeline M. Sinkovich (P82846)
                                          Attorneys for Plaintiff
                                          26700 Lahser Road, Suite 401
                                          Southfield, MI  48033
                                          (866) 939-2656
                                          sradner@excololaw.com
                                          msinkovich@excololaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of February 2020, I served all parties having appeared in this matter, with a copy of the foregoing document, by filing same with the Clerk of Court using the CM/ECF system which will send notification of such filing electronically to all parties via their counsel of record.

*/s/ Solomon M. Radner*
Solomon M. Radner